T.C. Memo. 2011-123

UNITED STATES TAX COURT

FREDERICK D. TODD, II AND LINDA D. TODD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26378-06.                    Filed June 6, 2011.

<u>David B. Shiner</u> and <u>Sanjay Shivpuri</u>, for petitioners.

<u>Angela B. Friedman</u>, <u>Jason W. Anderson</u>, and <u>David S. Weiner</u>,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  After concessions, the issues for decision
are:  (1) Whether petitioner Frederick D. Todd II (petitioner)
received a taxable distribution of $400,000 from United Employee
Benefit Fund (UEBF) in 2002; (2) alternatively, if petitioner did
not receive a taxable distribution from UEBF in 2002, whether

petitioner received $412,973 of discharge of indebtedness income in 2003; (3) whether petitioners are liable for an addition to tax under section 6651(a)(1) for 2003; and (4) whether petitioners are liable for a section 6662 penalty for 2002 or 2003.[1]

Some of the facts have been stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Texas.

FINDINGS OF FACT

Petitioner was a practicing neurosurgeon employed by Frederick D. Todd, II, M.D., P.A. (corporation), a Texas corporation of which petitioner was the sole shareholder, director, and president. The corporation also employed a few individuals who worked with petitioner.

On August 18, 1995, petitioner signed an application on behalf of the corporation to become a member of the American Workers Master Contract Group (AWMCG), authorizing AWMCG to represent the corporation in negotiations with the National Production Workers Union Local 707 (Local 707), the union representing the corporation's employees. The corporation agreed

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) as amended and in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded down to the nearest dollar.

to provide eligible employees with a death benefit only (DBO) plan organized through the American Workers Benefit Fund (AWBF), a welfare benefit fund established between AWMCG and Local 707.

The agreement provided that upon a covered employee's death, AWBF would provide the employee's designated beneficiary with an amount equal to eight times the employee's annual income up to $6 million. However, AWBF's obligation to pay a death benefit ceased if the corporation's covered employee was voluntarily or involuntarily terminated or retired; if the corporation ceased making contributions; or if the master contract between the union and the master contract group was not renewed. As an eligible employee of the corporation, petitioner enrolled in the DBO plan, designating petitioner Linda D. Todd as the beneficiary of the $6 million death benefit. A few of petitioner's fellow eligible employees also participated in the DBO plan.

On September 5, 1995, petitioner submitted an application for life insurance to Southland Life Insurance Co. (Southland) on behalf of AWBF. On November 15, 1995, Southland issued a $6 million universal life insurance policy (policy No. 5160) on petitioner's life to AWBF. The annual premium on policy No. 5160 was approximately $100,000. The policy was owned solely by AWBF to provide insurance to fund the death benefit owed by AWBF to petitioner's wife if petitioner died. The corporation made yearly contributions to AWBF on behalf of petitioner and his

fellow covered employees and deducted those payments under section 419A(f)(5).  Upon receipt of the corporation's yearly contribution, AWBF paid the premium on policy No. 5160.

On July 21, 1999, petitioner submitted another application for life insurance to Southland.  On October 1, 1999, Southland issued a $6 million indexed universal life insurance policy (policy No. 8889) on petitioner's life that required an annual premium of approximately $100,000.  On December 3, 1999, petitioner transferred ownership of policy No. 8889 to AWBF.  On January 28, 2000, AWBF rolled policy No. 5160, which had an accumulation value of $315,773, into policy No. 8889 pursuant to section 1035, resulting in a single $6 million policy on petitioner's life.

On December 18, 2000, AWBF merged into United Employees Benefit Fund (UEBF).  UEBF was a welfare benefit fund established between Professional Workers Master Contract Group and the Union of Needletrades, Industrial and Textile Employees, Local 2411 (Local 2411), to provide a DBO plan to eligible employees of participating employers.  Before November 2001 petitioner's corporation made yearly contributions to AWBF on behalf of petitioner and his fellow covered employees and deducted those payments as contributions to AWBF.  After receiving notice of the transfer of the insurance policies on the lives of the corporation's employees from AWBF to UEBF on November 15, 2001,

the corporation made contributions to UEBF, which paid the premiums on the Southland life insurance policies held on the lives of petitioner and his covered employees.

Under article 8 of the UEBF Trust Agreement (trust agreement), the employer and employee trustees had discretionary authority to make loans to a plan participant on a nondiscriminatory basis.[2] Upon an application and written evidence of an emergency or serious financial hardship from the eligible employee, the trustees could make a loan up to the amount of the present value of the death benefit.[3] David Fensler was a certified employee benefit specialist and was the employer trustee and administrator of both UEBF and AWBF. James Skonicki was the employee trustee of UEBF from before 1998 through 2002. On May 20, 2002, Southland notified petitioner's insurance agent that the maximum available distribution from policy No. 8889 was $400,000 and that any greater distribution would cause the policy to lapse. On July 11, 2002, petitioner submitted to UEBF an application for a loan of $400,000 for "unexpected housing costs".

---

[2]The loan requirements of AWBF and UEBF were the same.

[3]The present value of the death benefit was to be actuarially computed using an assumed interest rate of 8 percent and an assumed mortality of age 75.

Upon receipt of petitioner's loan application, Mr. Fensler recommended to Mr. Skonicki that the loan[4] to petitioner be approved. Neither Mr. Fensler nor Mr. Skonicki made further inquiries into the hardship claimed by petitioner. On August 26, 2002, Mr. Fensler submitted a policy loan request to Southland requesting a loan of $400,000 on policy No. 8889. However, after receiving the loan check, Mr. Fensler decided that the 4.76-percent interest rate charged by Southland on the loan made the choice of a partial surrender from policy No. 8889 a better prospect.[5] On August 30, 2002, petitioner agreed to a distribution, which would reduce the face value of policy No. 8889 to $5,600,000. On September 18, 2002, Southland reissued a check for $400,000 to UEBF representing the distribution from policy No. 8889. Upon receipt of the funds from Southland, UEBF issued a check for $400,000 to petitioner on September 25, 2002. On October 25, 2002, the corporation made its annual contribution to UEBF for petitioner's DBO plan, and on January 7, 2003, UEBF

---

[4]Our reference to the transaction as a loan is made for ease of discussion. This reference is not dispositive of the status of the transaction, and the determination of whether the transaction between petitioner and UEBF is a valid debt for tax purposes is the subject of discussion below.

[5]The midterm applicable Federal rate, applicable to loans with terms of 3 to 9 years, was 3.75 percent for loans originating in September 2002. See sec. 1274(d); Rev. Rul. 2002-53, 2002-2 C.B. 427. The long-term applicable Federal rate for loans originating in September 2002 was 5.23 percent. Rev. Rul. 2002-53, 2002-2 C.B. at 428.

made a premium payment to Southland on policy No. 8889. After 2003, however, petitioner's corporation stopped making its annual contributions to UEBF on behalf of petitioner's DBO plan, and UEBF ceased premium payments on policy No. 8889.

The trust agreement provided that a loan from UEBF had to be secured by a pledge of the actuarially determined present value of the eligible employee's death benefit and evidenced by an executed promissory note that provided for payments at least quarterly. The trust agreement also required that the loan bear a reasonable rate of interest, taking into account the interest rates charged by persons in the business of lending money for loans which would be made under similar circumstances.

Six months after the $400,000 check was delivered to petitioner, and after Mr. Fensler provided an amortization schedule, on March 21, 2003, petitioner signed a promissory note to UEBF in the amount of $400,000. The stated interest on the note was 1 percent, and the note provided that petitioner make quarterly installment payments of $20,527 beginning on November 1, 2002, and continuing until the note was paid.

The note and the trust agreement also included an alternative means of repayment, referred to by petitioners as a "dual repayment mechanism". In the absence of quarterly payments by petitioner, the dual repayment mechanism allowed UEBF to deduct the outstanding loan balance from any payment or

distribution due from UEBF to the participant or his beneficiary. According to UEBF, the dual repayment mechanism prevented a participant from defaulting on his obligation to repay the loan while any payments or distributions were due to the participant under the terms of the agreement. At the end of 2002 and 2003, petitioner owed a principal balance of $400,000. As of the date of trial, petitioner had not made any payments on the note, and UEBF had taken no action to collect on the note.

The trust agreement required that UEBF hire an auditor to conduct a certified audit and issue an opinion as to the UEBF financial statements. An accounting firm conducted a certified audit and, despite the dual repayment mechanism and its purported protection against default, determined that the purported loan to petitioner was in default because of the nonreceipt of payments. For the taxable years 2002 and 2003, the auditor required UEBF to report the loan as uncollectible or in default in 2002 and 2003 on Schedules G of Forms 5500, Annual Return/Report of Employee Benefit Plan. UEBF and its trustees issued a statement expressing disagreement with the auditor, explaining that the dual repayment mechanism prevented the loan from entering default under the terms of the trust agreement and UEBF's policies and procedures. The statement likewise explained that the loan was not in default or uncollectible because petitioner's death

benefit owed by UEBF under the DBO plan would provide the necessary collateral for the payment of the promissory note.

On July 5, 2005, petitioners filed delinquent 2002 and 2003 Federal income tax returns.  On September 21, 2006, respondent issued a notice determining deficiencies for 2002 and 2003 of $65,237 and $16,719, respectively, together with section 6662(a) penalties of $13,047 and $3,344, respectively.  The deficiencies were based primarily on unreported dividends from life insurance contributions made on petitioner's behalf by the corporation and denial of petitioners' claimed charitable contribution deductions.  Petitioners filed a petition with the Tax Court for 2002 and 2003 on December 21, 2006.

In preparation for trial, respondent discovered petitioner had received a $400,000 distribution from UEBF in 2002.  Arguing that the distribution was taxable upon receipt, respondent filed an amendment to answer and asserted an increased deficiency for 2002 of $224,269 and an increased penalty under section 6662(a) of $44,854.  Respondent alternatively argued that if the $400,000 distribution was a valid loan, the indebtedness was discharged in 2003 and resulted in a deficiency for 2003 of $165,596 and a penalty under section 6662(a) of $33,139.  Respondent also asserted an addition to tax under section 6651(a)(1) of $29,184 for 2003 but none for 2002.

OPINION

## I.   Burden of Proof

As a general rule the taxpayer bears the burden of proving that the Commissioner's determinations set forth in a notice of deficiency are erroneous.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111 (1933).  However, the Commissioner has the burden of proof as to any new issue or increased deficiency.  Rule 142(a)(1).  Respondent concedes that he bears the burden of proof because the only issues to be decided were raised in the amendment to answer.

## II.   Loan or Plan Distribution

The parties agree that petitioner received $400,000 from UEBF on September 25, 2002.  Petitioners maintain that the distribution was a loan which petitioner intended to repay.  Respondent argues that the distribution from UEBF to petitioner was taxable income.  The parties agree that UEBF did not distribute the funds in satisfaction of its obligation to petitioner's beneficiaries under the DBO plan.

Section 61(a) provides the following broad definition of the term "gross income":  "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived".  Exclusions from gross income must be narrowly construed.  Commissioner v. Schleier, 515 U.S. 323, 328 (1995).  One such exclusion excepts the receipt of loan proceeds from

gross income because the temporary economic benefit of income is offset by a corresponding obligation to repay.  United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967); Dennis v. Commissioner, T.C. Memo. 1997-275.  However, for genuine indebtedness to be present there must be both good-faith intent on the part of the borrower to repay the debt and good-faith intent by the lender to enforce payment of the debt.  Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. Chism Ice Cream Co. v. Commissioner, T.C. Memo. 1962-6; Wright v. Commissioner, T.C. Memo. 1992-60.

The U.S. Court of Appeals for the Fifth Circuit, to which an appeal in this case would lie absent a stipulation otherwise, has held that whether a transaction constitutes a loan for income tax purposes is a factual question involving several considerations, and a distinguishing characteristic of a loan is the intention of the parties that the money advanced be repaid. Moore v. United States, 412 F.2d 974, 978 (5th Cir. 1969). Important factors considered by courts in finding a bona fide debt are whether:  (1) The promise to repay was evidenced by a note or other instrument; (2) interest was charged; (3) a fixed schedule for repayments was established; (4) collateral was given to secure payment; (5) repayments were made; (6) the borrower had a reasonable prospect of repaying the loan, and whether the lender had sufficient funds to advance the loan; and (7) the

parties conducted themselves as if the transaction was a loan. See Goldstein v. Commissioner, T.C. Memo. 1980-273 (and cases cited therein). We address each factor in turn.

    A.    Whether the Promise To Repay Was Evidenced by a Note or Other Instrument

A note or other instrument is indicative of a debtor-creditor relationship. Teymourian v. Commissioner, T.C. Memo. 2005-232. However, an instrument will be given little weight when the form of the instrument fails to correspond with the substance of the transaction. Provost v. Commissioner, T.C. Memo. 2000-177.

On September 25, 2002, UEBF issued a $400,000 check to petitioner. Six months later, on March 21, 2003, petitioner signed a promissory note to UEBF for a loan of $400,000. Despite the requirements within the trust agreement, the parties failed to contemporaneously memorialize the indebtedness when the money was distributed to petitioner. Moreover, the record further reflects that neither petitioner nor UEBF adhered to the terms of the promissory note or the trust agreement that governed the transaction. UEBF failed to charge a market rate of interest, petitioner did not make quarterly payments as required under the promissory note, and UEBF did not attempt to collect the amount owed or any portion thereof after petitioner defaulted.

For the foregoing reasons, the Court finds that neither petitioner nor UEBF strictly complied with the terms of the loan

agreement or the promissory note.  Thus, the Court gives the promissory note little weight.  This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

B.    Whether Interest Was Charged

The payment of interest indicates the existence of a bona fide loan.  Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), affg. T.C. Memo. 1998-121; Teymourian v. Commissioner, supra; Morrison v. Commissioner, T.C. Memo. 2005-53.  The trust agreement provided that a reasonable rate of interest should be charged, taking into account the interest rates charged by persons in the business of lending money under similar circumstances.  Southland charged a rate of 4.76 percent on a similar loan, and petitioner acknowledges that the 1-percent interest rate charged on the promissory note was lower than the market rate.  The failure of UEBF and petitioner to agree to a reasonable market rate of interest as dictated by the trust agreement indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

C.    Whether a Fixed Schedule for Repayment Was Established

A fixed schedule for repayment is indicative of a bona fide loan.  Welch v. Commissioner, supra at 1231; Teymourian v. Commissioner, supra.  Evidence that a creditor did not intend to enforce payment or was indifferent to the exact time an advance

was repaid indicates a bona fide loan did not exist. Gooding Amusement Co. v. Commissioner, 23 T.C. 408, 418-419 (1954), affd. 236 F.2d 159 (6th Cir. 1956); Provost v. Commissioner, supra.

According to the promissory note, petitioner was to make quarterly installment payments of $20,527 beginning on November 1, 2002, and continuing until the note was fully paid.  Three months after the first payment was due, UEBF provided petitioner with an amortization schedule reflecting quarterly payments that should have been paid beginning on November 1, 2002.  Almost 4 months after the first payment was due, the parties finally executed the promissory note.  Petitioner did not make any payments to UEBF, and UEBF never attempted to collect the amount owed after each default.  This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

D.  Whether Collateral Was Given To Secure Payment

Respondent argues that petitioner provided no collateral because he did not own or have any rights in the Southland insurance policies purchased on his life.  AWBF secured the potential death benefit obligation by purchasing policy No. 5160 from Southland.  On July 21, 1999, petitioner purchased his own policy from Southland, policy No. 8889.  However, on December 3, 1999, petitioner transferred ownership of policy No. 8889 to AWBF, which rolled the balance of policy No. 5160 into policy No.

8889. After the merger of AWBF and UEBF in 2000, policy No. 8889 became the property of UEBF. At the time of the purported loan, petitioner did not own the policy, had no access to the cash value of the policy, and had no rights to the proceeds from the policy. Thus, respondent correctly states that the policy cannot be treated as collateral for petitioner's purported loan.

In response, petitioners claim that the death benefit owed to them by UEBF under the DBO plan, and not the Southland insurance policies, provided the necessary collateral for the payment of the promissory note. Petitioners argue that when combined with the death benefit owed by UEBF, the dual repayment mechanism served as collateral since any balance remaining on the loan at the time of petitioner's death would reduce the death benefit payable by UEBF to his beneficiaries. Thus, petitioner claims he provided the necessary collateral despite making no payments or relinquishing control over any property in favor of UEBF.

In our analysis below we find the dual repayment mechanism does not serve as a valid repayment method for purposes of classifying the distribution to petitioners as a bona fide loan. However, the mechanism could serve as security between the parties for the promissory note. For example, if petitioner died having met all conditions precedent entitling him to death benefits, UEBF would receive $5,600,000 from Southland and would

be obligated to pay $6 million to petitioner's beneficiary.  The dual repayment mechanism agreed to by petitioners provides security and allows UEBF to deduct the $400,000 distribution from the death benefit obligation.  This factor indicates the parties possible intent to establish a debtor-creditor relationship at the time the funds were advanced.

E.    Whether Repayments Were Made

Repayment is an indication that a loan is bona fide.  Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970).  Although petitioner signed a promissory note obligating him to make quarterly payments beginning in November 2002, as of the date of trial petitioner had not made any payments toward the purported loan.  Petitioners argue that the dual repayment mechanism serves as a valid method of repayment.

For a valid debt to exist for tax purposes, there must exist an unconditional obligation to repay.  Midkiff v. Commissioner, 96 T.C. 724, 734-735 (1991) ("Indebtedness is 'an existing, unconditional, and legally enforceable obligation for the payment of a principal sum.'", affd. sub nom. Noguchi v. Commissioner, 992 F.2d 226 (9th Cir. 1993) (quoting Howlett v. Commissioner, 56 T.C. 951, 960 (1971))).  If a repayment mechanism is too contingent and indefinite, the alternative payment method is not recognized.  Zappo v. Commissioner, 81 T.C. 77, 87-88 (1983).

Despite petitioners' characterization of the transaction and the dual repayment mechanism, there are significant conditions precedent to petitioners' receipt of a death benefit under the DBO plan from UEBF. If the corporation ceased participation in the UEBF plan, if the covered employee was voluntarily or involuntarily terminated or retired, or if the master contract group and Local 2411 failed to renew their agreement, then UEBF was not required to pay any benefits. Thus, even if petitioner had rights to a death benefit, the rights were contingent because if any of the foregoing conditions were present at the time of his death, his beneficiaries would not receive benefits from UEBF. Because the purported benefits were contingent upon multiple future events, petitioner cannot reasonably rely on the death benefit as an alternative payment method to show that the loan would be unconditionally repaid. This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

F. <u>Whether the Borrower Had a Reasonable Prospect of Repaying the Loan and Whether the Lender Had Sufficient Funds To Advance the Loan</u>

This factor is best determined by looking to whether there was "a reasonable expectation of repayment in light of the economic realities of the situation" at the time the funds were advanced. <u>Fisher v. Commissioner</u>, 54 T.C. 905, 909-910 (1970). A reasonable prospect of repayment at the time the funds were

advanced indicates the existence of a bona fide loan.  Welch v. Commissioner, 204 F.3d at 1231.

Petitioner earned a substantial living as a neurosurgeon, and there was a reasonable prospect of petitioner's repaying the purported loan.  This factor favors the existence of a debtor-creditor relationship between the parties.

G.    Whether the Parties Conducted Themselves as if the Transaction Were a Loan

The conduct of the parties may be sufficient to indicate the existence of a loan.  Baird v. Commissioner, 25 T.C. 387, 395 (1955); Teymourian v. Commissioner, T.C. Memo. 2005-232; Morrison v. Commissioner, T.C. Memo. 2005-53.

Petitioners produced little evidence showing UEBF and petitioner conducted themselves in a manner indicating that UEBF's distribution of $400,000 to petitioner was a loan. Although petitioner executed a loan application and a promissory note, neither party strictly abided by their terms.  First, petitioner failed to provide any written evidence of the unexpected housing costs that necessitated the loan application, and UEBF made no further inquiry into the hardship.  Second, the interest rate was below market, petitioner failed to make any quarterly payments as required under the promissory note, and UEBF never attempted collection.  Third, the promissory note was not executed for almost 6 months after the funds were advanced. Lastly, petitioner's corporation ceased making contributions to

UEBF to fund petitioner's death benefit shortly after petitioner received the $400,000 distribution from UEBF.

This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the funds were advanced.

H.    Conclusion

In accordance with our analysis above, respondent has met his burden of proving that the distribution of $400,000 did not constitute a bona fide loan.  On this record, the Court holds that petitioners improperly failed to report as income the $400,000 UEBF distributed to petitioner in 2002.  Because of our findings herein, it is unnecessary to address the parties' arguments regarding a discharge of indebtedness by UEBF or the year in which it occurred.

III. Penalties and Additions to Tax

A.    Addition to Tax Under Section 6651(a)(1)

Section 6651(a)(1) imposes an addition to tax in the case of any failure to timely file a Federal income tax return unless it is shown that such failure is due to reasonable cause and not willful neglect.  A showing of reasonable cause requires petitioners to demonstrate they exercised ordinary business care and prudence and nevertheless were unable to file the return by the due date.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners filed their returns for 2002 and 2003 on July 5,

2005.  Respondent did not assert a section 6651(a)(1) addition to tax for 2002.  The amount of the section 6651(a)(1) addition to tax is a computational matter based on the amount of tax due.  To the extent respondent bears the burden of proving an increased section 6651(a)(1) addition to tax, respondent has met this burden if petitioners' concessions result in an increased deficiency for 2003.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001); Howard v. Commissioner, T.C. Memo. 2005-144.

Petitioners admit that they did not have reasonable cause for their failure to timely file and failed to argue that the addition should not apply.  Accordingly, we conclude that petitioners are liable for an addition to tax under section 6651(a)(1) for 2003 in an amount to be determined in the Rule 155 computation.

B.    Accuracy-Related Penalty Under Section 6662

Petitioners contest the imposition of an accuracy-related penalty for 2002.[6]  Section 6662(a) and (b)(1) and (2) imposes a 20-percent accuracy-related penalty upon any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations, or substantial understatement

_____

[6]Because of the parties' concessions and our holding that petitioners improperly failed to report the $400,000 distribution as income in 2002, we find it unnecessary to address respondent's alternative position regarding the imposition of the accuracy-related penalty for 2003 or petitioners' response thereto.

of income tax.  Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard.  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to the rule or regulation.  Sec. 1.6662-3(b)(2), Income Tax Regs.  Disregard of rules or regulations is reckless if the taxpayer makes little or no effort to determine whether a rule or regulation exists.  Id.  An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

Under section 7491(c), the Commissioner bears the burden of production with respect to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties.  Higbee v. Commissioner, supra at 446-447.  Once respondent meets his burden of production, petitioners bear the burden of proof as to substantial authority, reasonable cause, or similar provisions.  Id.  In an amendment to answer, respondent asserted an increased penalty based on the asserted increased deficiency for each year at issue.  To the extent respondent bears the burden of proof for the increased 2002 penalty, we find

that respondent has met that burden. See <u>Bhattacharyya v. Commissioner</u>, T.C. Memo. 2007-19; <u>Howard v. Commissioner</u>, <u>supra</u>.

Respondent has proved that petitioners improperly excluded from income in 2002 the $400,000 distribution from UEBF, which exceeds both 10 percent of the tax required to be shown on the return and $5,000. Respondent has also shown that petitioners negligently disregarded rules and regulations by failing to make a reasonable attempt to ascertain the correctness of the treatment of the distribution. Petitioners arranged for a distribution from the policy, accepted funds, and made no attempt to make payments on the purported loan, thus defaulting. Moreover, petitioner provided no evidence that he discussed his failure to meet the terms of his purported loan with his tax return preparer or made any attempt to determine the correct treatment of his failure to report any income associated with the distribution on his income tax return. This evidence is sufficient to indicate that it is appropriate to impose a penalty under section 6662(a) for 2002, except to any portion of the underpayment as to which petitioners acted with reasonable cause and in good faith. See sec. 6664(c)(1); <u>Higbee v. Commissioner</u>, <u>supra</u> at 448. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on professional advice may constitute reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. However, the taxpayer cannot avoid the penalty merely by having a professional adviser read a summary of the transaction and offer advice that assumes the facts presented are true. See Novinger v. Commissioner, T.C. Memo. 1991-289. Moreover, the professional's advice must be based on all pertinent facts and circumstances; and, if the adviser is not versed in the nontax factors, mere reliance on the tax adviser may not suffice. See Addington v. United States, 205 F.3d 54, 58 (2d Cir. 2000); Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Freytag v. Commissioner, supra at 888, 889.

For a taxpayer's reliance on advice to be sufficiently reasonable so as to negate possible liability for the accuracy-related penalty, the Court has stated that a taxpayer must satisfy a three-prong test by showing:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance;  (2) the taxpayer provided the adviser with the necessary and accurate information; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology

Associates P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd, 299 F.3d 221 (3d Cir. 2002).

Petitioners claim that they relied on the tax advice of Jeffrey Oerke, C.P.A., who prepared their 2002 return, and thus reasonable cause exists. However, there is no evidence that Mr. Oerke had any particular expertise in employee benefit plans or that petitioners thought he had such expertise. Furthermore, petitioners failed to show that they provided Mr. Oerke with all the necessary and accurate information to properly prepare their returns or evaluate the purported loan. Petitioner testified that although he provided Mr. Oerke with a copy of the promissory note, he was unsure whether Mr. Oerke received any documents related to the DBO benefit plan. Finally, the record indicates that petitioner did not seek or receive an opinion from Mr. Oerke regarding the validity of the purported loan transaction. Instead, Mr. Oerke merely prepared petitioners' income tax return for 2002 from the documents petitioners provided. As we have stated, reliance on the mere fact that a certified public accountant has prepared a tax return does not mean that he or she opined on any or all of the items reported herein. Id. at 100. For all of the foregoing reasons, petitioners are precluded from now arguing that they relied on the tax advice of Mr. Oerke.

We conclude that petitioners' underpayment for 2002 was the result of their substantial understatement of income tax and

their negligence and disregard of rules or regulations under section 6662.  We also conclude that petitioners are not entitled to the reasonable cause and good faith defense under section 6664 because they did not rely on their accountant.  Thus, we find that petitioners are liable for the accuracy-related penalty for 2002 pursuant to section 6662 in an amount to be determined in the Rule 155 computation.  We do not impose a section 6662 penalty for 2003.

The Court, in reaching its holdings, has considered all arguments made, and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.