T.C. Memo. 2012-290

UNITED STATES TAX COURT

H & M, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16612-09.            Filed October 15, 2012.

<u>Jon J. Jensen</u>, for petitioner.

<u>William R. Peck</u> and <u>John P. Healy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>: H & M, Inc. is a small corporation that sold its biggest asset, an insurance-brokerage business, to a local bank in 1992. H & M's owner kept the corporation active--he says--to exploit his two patented inventions. He himself went to work for the bank that bought the brokerage business, and now the

**[*2]** Commissioner says some of his wages were actually disguised purchase-price payments to the corporation, while interest payments the corporation deducted were actually dividends to him. The Commissioner also contests a number of expenses that H & M tried to deduct even after the patents expired. There are also accuracy-related penalties for us to look at.

FINDINGS OF FACT

I.    Background

Not very many people live in Harvey, North Dakota, a small town in north central North Dakota that sits on the eastern edge of the Williston Basin, site of what is now the biggest American oil boom in decades. The town has only a couple thousand residents, and at least before the boom only about a half dozen people moved there in any given year, fewer than died or moved away. But though it's a small town, Harvey has a business district, and people from the surrounding areas--even smaller towns as well as farms--come to Harvey for their errands.

Harold Schmeets moved to Harvey in the late 1960s, and began selling insurance as an employee of the National Bank of Harvey's insurance agency, which at the time was housed in the same building as the bank. But Schmeets wanted to have his own business, and in the 1970s began to buy the bank's

[*3] insurance agency a little bit at a time after the bank's owners decided to sell their shares in the agency. By around 1980 Schmeets had become the agency's sole shareholder. Even after the sale, however, he continued to operate the agency--now called Harvey Insurance Agency, Inc.--in the same building as the bank. In 1983, however, the bank built a new and bigger office and got back into the insurance business. Schmeets, with his former employer now a rival, moved to a different building a few blocks away.

The bank was not Schmeets's only competition, especially in the property and casualty insurance business. At the time Schmeets moved his business, there were around 15 independent insurance agents in Harvey and the surrounding communities, most within a 30-mile radius. Fortunately for them, their customer base was more than just the residents of Harvey--there were roughly 5,000 to 6,000 people, mostly farmers, in the area the agents served. The area's stable population made for a difficult market, though, and getting a new customer often meant taking him away from his old agent. And the insurance business in the area was "extremely personal"--running a successful agency depended largely on the individual agent's relationships with his customers.

Despite the competitive market, Schmeets stood out among insurance agents in the area. He had experience in all insurance lines and all facets of running an

[*4] insurance agency, including accounting, management, and employee training. He also had experience in a specialized area of insurance called bonding,[1] and his agency was the only agency in the area, aside from the bank's, that did this kind of work. There was convincing testimony that in the area around Harvey no one knew insurance better than Schmeets, and even some of his competitors called him the "King of Insurance." We also find that when people came to Harvey Insurance to buy insurance, they were buying it from Harold Schmeets, and that he had far more name recognition as an individual than Harvey Insurance did as a firm. Under Schmeets's direction, Harvey Insurance did well enough to hire several employees--though Schmeets was the only one who actively solicited insurance business--but it paid Schmeets only about $29,000 per year.

After its split from Schmeets, the bank's new insurance business–called National Insurance Agency, Inc.--grew slowly.[2] It was a one-man agency and had two different managers during the time it competed with Schmeets. The managers didn't have as much experience as Schmeets, didn't know how to deal with some

---

[1] Bonds--for example, bid, payment, and performance bonds to contractors-- are financial guaranties that the bond's purchaser will meet his obligations.

[2] We refer to the bank's insurance "agency" or "business" throughout, but note here that the insurance agency is the bank's sister corporation and both are owned by the same holding company.

[*5] of the large insurance companies as well as Schmeets, and soon had difficulty turning a profit and keeping customers.

Despite being competitors, Schmeets and Gary Bergstrom, the bank's president since 1984, spoke frequently about the insurance business. (They had met when Bergstrom started to work for the bank in 1972.) Schmeets even wrote an occasional policy for National Insurance when the bank's insurance agent was too inexperienced or didn't do business with a particular insurance company.

As the '80s turned into the '90s, the insurance industry--especially the big companies--began to demand volume from independent agents. This was a problem in rural parts of the country, and Schmeets and Bergstrom often found their conversations turning to the difficulty their respective agencies had in finding enough customers to keep their contracts with large insurance companies. A major reason for the difficulty was that each insurance company didn't write all the types of insurance policies that customers in a place like Harvey needed. This meant that conscientious agents needed to contract with a large number of insurance companies, but then ran into the demand from insurance companies that agents maintain a certain volume of business. One large insurance company, St. Paul Insurance, did cut off Schmeets's agency because the company didn't want to

**[*6]** write and service policies off the main highways of North Dakota, where there just wasn't enough business.

II.    Sale of Harvey Insurance

In January 1992 Bergstrom and Schmeets began to chat about whether to merge the two agencies. Both thought that it would help them stay in business by shoring up their shrinking customer base. The bank also thought a merger would revive its own insurance business's profitability. Schmeets agreed that the bank's daily foot traffic could be helpful in attracting clients. He also thought joining agencies would help him--he had employees who wanted benefits, and his agency was not in a position to provide them.

These chats ripened into negotiations. Schmeets knew what he wanted for the next six years, and the parties began their negotiations from there. Schmeets was most concerned with guaranteed employment, and he wanted deferred compensation payments to provide for his family and pay for his children's college educations. The parties were not focused on a particular number or the deal's tax consequences, but looked to see if a particular compensation package fit Schmeets's needs and then if it worked from National Insurance's perspective. After going back and forth several times, they eventually made a deal.

[*7]   The bank's legal counsel prepared the two key documents:  a purchase agreement and an employment agreement.[3]  Under the purchase agreement, Harvey Insurance agreed to sell "all files, customer lists, insurance agency or brokerage contracts, the name of Harvey Insurance, and all the good will of Harvey Insurance" to National Insurance for $20,000, payable in six equal annual installments plus interest.  This purchase agreement was contingent on the parties' execution of an employment agreement with Schmeets.  And it contained a noncompete provision which specified that Harvey Insurance and Schmeets would not compete with National Insurance for 15 years and, if they did, National Insurance could terminate any unpaid purchase price payments to Harvey Insurance and the employment agreement with Schmeets.

The employment agreement made Schmeets the manager of National Insurance for a six-year term beginning in March 1992.  Schmeets promised to perform an extensive list of managerial duties, which included developing insurance sales and products, hiring and training employees, and keeping the agency's books and records.  National Insurance promised to pay him an "annual

---

[3] Schmeets didn't hire his own lawyer for the negotiations, and it was only after the documents were ready for his signature that he asked H & M's accountant, Mark Larson, to take a look at them.  He never sought advice from Larson, however, on how to structure the deal.

**[*8]** base wage" of $38,936, "annual variable compensation" equal to the greater of $50,000 or 45% of "net adjusted income" for the year,[4] and "deferred compensation" of $74,000 at the end of the six-year term.[5] If Schmeets died, National Insurance still had to pay Schmeets the "annual base wage" and "deferred compensation" for services already performed. The total compensation under the agreement was over $600,000 for Schmeets's services during the six years. Both parties thought the compensation package was fair, and they did not have anyone appraise Schmeets's insurance agency. The bank didn't even look at the agency's financial records.

In March 1993 National Insurance and Schmeets changed the timing of the compensation payments that National Insurance had promised to pay Schmeets. The revised agreement provided that part of Schmeets's compensation would be deferred and earn interest, and then be paid out over a seven-year period beginning in March 1999. If Schmeets died before the complete payout of the deferred-

---

[4] The "net adjusted income" was based on total accrued income, total accrued expenses, accounts receivable, and premiums National Insurance paid on the key-man insurance policy it took out on the life of Schmeets.

[5] The employment agreement contained a noncompete provision similar to the one in the purchase agreement, which said that National Insurance could terminate the contract and stop making payments if Schmeets competed with National Insurance during his employment or for 10 years after.

[*9] compensation balance, National Insurance still had to make annual payments to Schmeets's estate. The total amount of deferred compensation under the agreement ended up being more than $340,000, as reflected in a Form W-2 the agency issued Schmeets in 1998.

Both parties kept their word. The bank's insurance agency dropped its name in favor of Harvey Insurance Agency, Inc. because Harvey Insurance had been around longer and had more name recognition because of its association with Schmeets. Schmeets served as its manager for the entire six-year term of the employment agreement, and the bank reported his compensation as wages subject to withholding and Federal Insurance Contributions Act (FICA) tax. Schmeets rewrote existing insurance policies, took new applications, supervised and trained the agency's four employees, attended bank planning sessions, negotiated commissions with insurance companies, and did the agency's bookkeeping. The transition multiplied his responsibilities, and Schmeets went from a 40-hour work week before the sale to almost double that after.

At the end of the six-year term, the bank was pleased with Schmeets's performance and asked him to continue to manage the agency under year-to-year contracts. Schmeets agreed and kept working several days a week for about $30,000 per year to help train his replacement. The replacement was an insurance

[*10] salesman that didn't have as much experience as Schmeets–he didn't do bonding work, and he had never been a manager. Despite this lack of experience, the bank paid the new man an annual salary of between $55,000 and $65,000. Having managed this last transition, Schmeets then retired.

III.     H & M and the Note Payable

Instead of liquidating the old Harvey Insurance Agency after its name and assets passed to the bank, the corporation's board of directors--which consisted of Schmeets, his wife Mona, and their son Stuart--decided to keep the corporate entity alive. The corporation reissued its stock under the new name of H & M, Inc. Schmeets remained the sole shareholder and president, and Mona continued to serve as its secretary/treasurer. The board of directors stayed the same.

In the months leading up to the sale this board agreed that Schmeets had been undercompensated for his services to the insurance agency in past years, though it never specified which years and what amounts. It recognized that the deal with National Insurance could free up some money to pay him, but postponed a decision on giving any of that extra cash to Schmeets.

**[*11]** At the end of March 1992 H & M issued Schmeets a promissory note, which Schmeets signed as H & M's president.[6] Under the note H & M promised to pay Schmeets $120,000 plus interest at the rate of 10%. The note didn't include any payment terms or a maturity date, and it was unsecured.[7] H & M treated the $120,000 obligation as accrued officer compensation on its 1992 income tax return, but didn't actually deduct it that year. That same return's balance sheet reflects that H & M had around $272,000 in retained earnings and $157,000 in cash at the end of 1992 and that it didn't make any distributions to Schmeets during the year.

H & M never paid anything--either interest or principal--on the note until 1999, and even after that, its payments were sporadic:

---

[6] H & M's minutes don't reflect the board's decision to issue the note, but minutes from a meeting held near the end of March 1992 reflect Schmeets's statement that "it will help to have at least the interest (on the old money) coming, it should be about $12,000.00 per year until we start a new business with the H&M corp."

[7] The note was on a preprinted form with a number of blanks. Schmeets filled in the amount and interest rate, but left blank the maturity date, interest accrual date, interest payment terms, whether the note was secured or unsecured, and the purpose of the credit.

[*12]

| Year | Interest | Principal |
|------|----------|-----------|
| 1999 | $16,307 | -0- |
| 2000 | 8,000 | -0- |
| 2001 | -0- | -0- |
| 2002 | 10,134 | -0- |
| 2003 | 10,000 | -0- |
| 2004 | 10,000 | -0- |
| 2005 | 10,000 | -0- |
| 2006 | -0- | -0- |
| 2007 | -0- | -0- |
| 2008 | -0- | -0- |
| 2009 | 130,123 | $120,000 |
| Total | 194,564 | 120,000 |

H & M deducted the amounts it paid as interest in tax years 2002, 2003, 2004, and 2005. The balance sheets of H & M's tax returns for those years list the $120,000 salary payable as a liability. They also indicate that H & M had more than $190,000 in cash and $240,000 in retained earnings at the beginning and end of each of those years and that H & M didn't make any distributions to Schmeets.

IV.   Use of H & M To Exploit Patents

Once Schmeets got out of the insurance business, he began to work on developing two inventions which he had created sometime before 1996--a boat

[*13] step and a collapsible shelf bracket. With the help of a lawyer from Fargo, North Dakota, Schmeets obtained patents for the inventions in 1998.

The boat step is a step that can be quickly attached to the frame or tongue of a boat trailer. Schmeets designed it to give boat users a better place to stand than on the frame of the boat trailer itself while winching the boat onto a trailer. Schmeets kept a "boat step history" log, which he used to document his work on the invention.

His collapsible shelf bracket is an iron bracket that he designed to bolt to a wall. It can hold a shelf and a tabletop and has two pieces that, when removed, collapse the bracket against the wall and out of the user's way. And when the bracket is not supporting a shelf or a tabletop, its user can hang various objects (such as a garden hose) on the bracket and adjust the bracket upward so nothing slips off.

Beginning in 1993 Schmeets used H & M to exploit his patents and work on perfecting their designs. He built prototypes, took his designs to various manufacturers for cost estimates, and experimented with different materials to discover the most cost-effective way to produce them. Schmeets testified that he used a pickup truck H & M owned to take the boat step and the shelf bracket to the manufacturers and to attend boat shows to learn about new trailer designs. He also

**[*14]** said he used the pickup to pull his boat to a marina one time and demonstrate his boat step to the general public. Because H & M had people testing the boat-step invention, it obtained product-liability insurance.

Neither patent proved very lucrative. Sometime around 2004 Schmeets saw a shelf bracket similar to his own in a book with hardware supplies for sale. He called the company that manufactured the shelf to say it was infringing on his patent, but the company's representative looked up Schmeets's patents and told him they had expired. It turned out that Schmeets had failed to pay the required maintenance fees. Schmeets memorialized the event in the boat-step history log: His one and only entry for 2004 reads: "A pause in activity due to researching patents as we have been informed that both patents have expired and we cannot locate the original patent attorney." His next entry after that wasn't until February 2006.

V.     Audit

The Commissioner audited H & M's returns for tax years 2001 through 2005. The audit dragged on, and the Commissioner sent a notice of deficiency in 2009 that determined about $70,000 in total deficiencies and penalties.

The notice of deficiency raised many issues, but the biggest-dollar one was whether H & M had received long-term capital gain and interest income in each of

[*15] the tax years at issue from the sale of Harvey Insurance back in 1992. The

Commissioner's theory was that Schmeets's wages under the employment and

salary-deferment agreements were actually payments to H & M for the sale of the

insurance business. He also disallowed H & M's deduction for interest that it paid

to Schmeets in tax years 2002 through 2005 on the promissory note. And, finally,

he disallowed a number of other deductions, including a 2001 net operating loss and

the expenses that H & M claimed that it had incurred in 2004 and 2005 to develop

Schmeets's patents.

H & M is a North Dakota corporation whose principal office was located in

Harvey when it filed its petition.

OPINION

I.    Employment Agreement Payments

The big issue in this case is whether the money Schmeets got under the

employment and salary-deferment agreements was really part of the purchase price

the bank paid to H & M for the sale of Harvey Insurance back in 1992.[8] During

---

[8] We don't need to decide whether the burden of proof shifts to the
Commissioner under section 7491(a). (Unless we say otherwise, all section
references are to the Internal Revenue Code in effect for the years at issue, and Rule
references are to the Tax Court Rules of Practice and Procedure.) Although the
Eighth Circuit held in Griffin v. Commissioner, 315 F.3d 1017, 1022 (8th Cir.
2003), vacating and remanding T.C. Memo. 2002-6, that we can't simply conclude
(continued...)

[*16] the years at issue, Schmeets received money from the bank's agency under their agreements. The Commissioner determined that all of the amounts paid to Schmeets in those years were really principal and interest payments to H & M for the sale of its insurance business. This recharacterization resulted in capital gain and interest income to H & M for each of the years at issue:

| Year | Capital gain | Interest income |
|------|------|------|
| 2001 | $39,065 | $18,560 |
| 2002 | 45,650 | 11,975 |
| 2003 | 43,894 | 13,731 |
| 2004 | 46,511 | 11,113 |
| 2005 | 49,277 | 8,348 |

---

[8](...continued)
the outcome is the same no matter which party bears the burden of proof, and this case is appealable (absent a stipulation to the contrary) to that circuit, see Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), it later explained that the burden of proof is relevant only in the event there is an evidentiary tie, see Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212. Both parties satisfied their burden of production by offering some evidence, so we decide this case on the weight of the evidence and instead of on an allocation of the burden of proof. See id.; see also Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

[*17] The Commissioner urges us to apply the substance-over-form doctrine[9] to find that the parties undervalued the assets of Harvey Insurance in the 1992 sale. He says the parties did the deal the way they did for the tax benefits: The bank wanted to deduct the compensation it paid to Schmeets, and Schmeets wanted to avoid being taxed twice on the proceeds of the sale--once at the corporate level when H & M received the purchase-price payments, and then again when he received dividends from H & M.

According to the Commissioner, a substance-over-form analysis shows that the value of the assets that National Insurance bought should include not only the $20,000 purchase price paid to H & M, but also the $38,936 "annual base wage" and $74,000 "deferred compensation" under the employment agreement paid to Schmeets.[10] This would leave only the annual variable compensation (the greater of $50,000 or 45% of "net adjusted income" for the year) as payment for Schmeets's services. This allocation, the Commissioner says, more accurately reflects the fair market value of Schmeets's services to the bank's agency, as well

---

[9] The doctrine tells us to ignore the form of a transaction in cases where the objective economic realities are to the contrary. See Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978).

[10] The Commissioner says recharacterizing the annual base wage and deferred compensation payments would result in a total purchase price of $327,616.

[*18] as Harvey Insurance's value at the time of the sale, because only this allocation would account for goodwill and the corporation's other intangible assets. The Commissioner points to several factors that he argues show that the form of the transaction doesn't match its substance:

- Schmeets's estate would still receive the entire annual base wage and deferred compensation if he died;

- the parties lacked documentation supporting the allocation;

- the parties did not have adverse interests in the transaction because there were tax advantages to allocating more of the overall price to compensation; and

- the fair market value of Schmeets's services to the bank's agency was much less than the amount he was being paid.

H & M counters that recharacterizing all of the compensation payments as purchase-price payments is inappropriate because the parties' allocation *does* reflect the economic realities of the transaction. It takes issue with the Commissioner's allocation of all of the insurance business's goodwill to a corporation few people knew about and argues that any goodwill of the business was attributable to Schmeets personally. It also says that Schmeets's compensation under the agreement was reasonable because the bank needed Schmeets to keep the insurance business going, and Schmeets had significant responsibilities as the manager of the bank's agency after the sale. And it points

[*19] out that instead of focusing on the tax consequences of the transaction, both parties wanted to create an employment relationship and both consistently treated the deal as if they had.[11]

We begin with the parties' arguments about goodwill. Goodwill is often defined as the expectation of continued patronage by existing customers. Newark Morning Ledger Co. v. United States, 507 U.S. 546, 572-73 (1993). It is an asset that can be sold with a professional practice. LaRue v. Commissioner, 37 T.C. 39, 44 (1961). And a professional practice's goodwill can attach to both the professional and the business. See, e.g., Schilbach v. Commissioner, T.C. Memo. 1991-556. Because there is no specific rule for determining the value of goodwill, we must consider and decide each case in light of its own particular facts. MacDonald v. Commissioner, 3 T.C. 720, 726 (1944). There will be no salable goodwill, however, where the business of a corporation depends on the personal relationships of a key individual, see Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 207-08 (1998), unless he transfers his goodwill to the corporation by entering into a covenant not to compete or other agreement so that his

---

[11] H & M also argues that the IRS employee responsible for its audit was biased. What goes on during audits, however, is generally irrelevant because of the *de novo* record on which we decide deficiency cases. Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-28 (1974).

[*20] relationships become property of the corporation, see Norwalk v. Commissioner, T.C. Memo. 1998-279, 1998 WL 430084, at *7.

In MacDonald, the taxpayers--who were husband and wife--were the shareholders of a corporation primarily engaged in the insurance-brokerage business. MacDonald, 3 T.C. at 721. The husband was experienced in the insurance business, and the development of the corporation's insurance-brokerage business was due to his personal ability and relationships with customers. Id. at 723. The MacDonalds liquidated their corporation and distributed all its assets-- including goodwill--to the husband. Id. at 721-22. The husband then set up a new insurance agency under the same name. Id. The Commissioner argued that valuable goodwill passed from the corporation to the taxpayers when they liquidated the corporation, and that therefore they had unreported taxable income. Id. at 725- 26. We held, however, that no goodwill passed to the taxpayers since the husband "was the Company" and any goodwill of the business "was due to the personal ability, business acquaintanceship, and other individualistic qualities of [the husband]." Id. at 727. We also found that the corporation didn't have any value beyond its tangible assets, since the husband's personal ability wasn't a corporate asset and there wasn't a contract or other agreement between the husband and the corporation for his future services. Id.

**[\*21]** Time hasn't seen much change in this part of the law. Martin Ice Cream Co. is a much more recent case, but we held there that a corporation could not be taxed on payments made to its controlling shareholder for his customer relationships, 110 T.C. at 209. The ice-cream company in that case distributed its products (including Häagen-Dazs) to both supermarkets and small stores. Id. at 192-93. Its controlling shareholder personally developed the valuable relationships with the supermarkets, and the corporation spun off its supermarket-distribution rights to a subsidiary wholly owned by that controlling shareholder, who then transferred them to Häagen-Dazs along with the subsidiary's business records, customer records, and associated goodwill. Id. at 195-203. The shareholder himself signed a consulting and noncompete agreement with Häagen-Dazs. Id. at 203-04. The Commissioner argued that the ice-cream company should be taxed on the gain from the sale of the sub, but we held that the customer relationships and distribution rights were the shareholder's personal assets and, since he never had a covenant not to compete or other agreement with the ice-cream company, the company couldn't be taxed on Häagen-Dazs's payments for them. Id. at 206-09.

This case is like MacDonald and Martin Ice Cream Co. The insurance business in Harvey is "extremely personal," and the development of Harvey Insurance's business before the sale was due to Schmeets's ability to form

[*22] relationships with customers and keep big insurance companies interested in a small insurance market. He grew relationships with large insurance companies that other brokers in the area didn't.[12] And we specifically find that when customers came to his agency, they came to buy from him--it was his name and his reputation that brought them there. We also find he had no agreement with H & M at the time of its sale that prevented him from taking his relationships, reputation, and skill elsewhere, which was precisely what he did when he began working for the bank's renamed insurance agency.

Beyond the business's goodwill, the Commissioner doesn't specify what other purchased intangible assets, other than the name Harvey Insurance, he thinks were not accounted for in the purchase price. We have already found that the name Harold Schmeets had by far more name recognition in the community than Harvey Insurance. And the Commissioner hasn't given us any persuasive evidence that the name of the corporation had much value other than its connection with Harold Schmeets himself. See Norwalk, 1998 WL 430084, at *7. The mere fact that National Insurance changed its name to Harvey Insurance after the sale doesn't account for the more than $300,000 in value that the

---

[12] As we note above, Schmeets even used his relationships with the large insurance companies to write an occasional policy for National Insurance while they were competitors.

[*23] Commissioner wants to attribute to the corporation or show that the corporation had goodwill apart from its connection with Schmeets. See MacDonald, 3 T.C. at 720-21, 730.

In light of Schmeets's personal relationships, his experience in running all facets of an insurance agency, and his responsibilities as manager of the bank's agency, we find that the compensation that the bank paid him was reasonable. The employment agreement contained an extensive list of duties Schmeets was required to perform as the agency's manager, and Schmeets went from working around 40 hours per week before the sale to double that afterward. His replacement was paid roughly $55,000 to $65,000 per year, though he was by comparison a mere Baron or Earl of Insurance in Harvey. And even after Schmeets's six-year employment term was up, the bank still paid him around $30,000 per year for part-time work to train his replacement.[13]

The Commissioner's expert's report, which estimated the fair market value of Schmeets's services to be $22,700 in 1994 and 1995; and $38,300 in 1996, 1997, and 1998, is entirely unbelievable. It ignored that Schmeets was more than an insurance salesman and that he had significant management and bookkeeping

---

[13] We also point out that the Commissioner said at trial he wasn't contesting that Schmeets had been undercompensated for his services in years before the sale.

[*24] responsibilities as manager of the bank's insurance agency.[14]  It also didn't account for his level of experience in the insurance industry and failed to explain why the fair market value of Schmeets's services was only $22,700 to $38,300 despite the fact that Schmeets's replacement, who was less experienced than Schmeets, was paid $55,000 to $65,000 per year.  We give the report no weight.

Even though we disagree with the Commissioner that the amounts the bank's agency paid Schmeets under their agreements were disguised purchase-price payments, we agree that the payments don't simply represent the fair market value of his services.  Not only did Schmeets bring his personal goodwill to the bank's agency, but he also signed agreements with National Insurance that contained noncompete provisions.  His employment agreement specifically said that "[a]s part of the consideration for this employment agreement * * * Schmeets agrees during the period of this employment contract, and for a period of ten years thereafter, not to compete with National Insurance."  Though we think it's clear some part of his compensation wasn't for his services, it's not necessary for us to

---

[14] The Commissioner's expert placed Schmeets in the category "Sales Agents and Placers, Insurance," which the 1998 Bureau of Labor Statistics Occupational Employment Statistics publication defined as "[s]ell life, endowments, fire, accident, and other types of insurance.  May refer clients to independent brokers, work as independent broker, or be employed by an insurance company."

[*25] determine the exact allocation between what he was paid for his services to the agency, his personal goodwill, and his promise not to compete, since Schmeets's individual tax liability is not before us. Cf. Kennedy v. Commissioner, T.C. Memo. 2010-206, 2010 WL 3703347, at *10 (whether payments to individual taxpayer arising from the sale of his business were proceeds from the sale of a capital asset or ordinary income required determination of whether they were for his services to the buyer after the sale, his personal goodwill, or his promise not to compete with the buyer).

We are satisfied that Schmeets and National Insurance were genuinely interested in creating an employment relationship and were not just massaging the paperwork for its tax consequences. Both insurance agencies feared going out of business, and both knew that there would be advantages to Schmeets's moving over to the bank. The bank's agency needed a more experienced manager who had good relationships with the big insurance companies. Schmeets wanted guaranteed employment and saw the potential to cross-sell to the bank's customers. There was virtually no discussion about the tax consequences of the transaction,[15] and the parties treated the transaction as an asset sale and

---

[15] The only tax discussions during the negotiations appeared to be about how the bank's agency would have to pay income tax withholding, FICA tax, etc. on

(continued...)

**[\*26]** employment relationship. Though we agree with the Commissioner that it would've been a lot easier if the parties had provided more documentation supporting their allocation, this doesn't mean their allocation was without substance. As the Supreme Court itself has held,

> where * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. * * *

Frank Lyon Co. v. United States, 435 U.S. 561, 583-84 (1978).

We therefore find that payments to Schmeets were not disguised purchase-price payments to H & M.

II.     Deductibility of Note Payments

The next issue is whether H & M can deduct as interest what it paid on the promissory note it gave to Schmeets in 1992. In the note--which didn't include any payment terms or a maturity date--H & M promised to pay Schmeets $120,000 plus interest at the rate of 10%. Though it didn't make any principal payments on the note until 2009, H & M did pay and deduct as interest on the note the following amounts during the tax years at issue:

---

[15](...continued)
Schmeets's wages.

[*27]

| Year | Amount |
|------|--------|
| 2002 | $10,134 |
| 2003 | 10,000 |
| 2004 | 10,000 |
| 2005 | 10,000 |

H & M argues that it should be able to deduct the amounts it paid to Schmeets as interest because the note represented a valid business debt.  It says the corporation's board agreed that Schmeets had not been adequately compensated for his services to Harvey Insurance before the sale and that it decided to issue him the note and make payments--but only to the extent possible after meeting the cash needs that the corporation would have in exploiting the patents.

The Commissioner says the note was more like equity than a debt.  He points to H & M's sporadic payments, the identity of interests between H & M and Schmeets, and the fact that the note had no maturity date.  If he's right, the amounts H & M paid to Schmeets in tax years 2002 through 2005 aren't deductible as interest.

Section 163 allows a deduction for "all interest paid or accrued within the taxable year on indebtedness."  Sec. 163(a).  To be deductible, however, the interest must be on a genuine debt owed by the taxpayer.  Knetsch v. United

[*28] <u>States</u>, 364 U.S. 361, 365 (1960); <u>Midkiff v. Commissioner</u>, 96 T.C. 724, 735 (1991), <u>aff'd sub nom.</u> <u>Noguchi v. Commissioner</u>, 922 F.2d 226 (9th Cir. 1993). The essence of *bona fide* indebtedness is that it is "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." <u>Howlett v. Commissioner</u>, 56 T.C. 951, 960 (1971).

Whether a payment represents debt or equity is a question of fact, <u>Delta Plastics, Inc. v. Commissioner</u>, T.C. Memo. 2003-54, 2003 WL 648856, at *3, and we look for both objective and subjective evidence of the parties' intent, <u>see</u> <u>United States v. Uneco (In re Uneco, Inc.)</u>, 532 F.2d 1204, 1209 (8th Cir. 1976). The Eighth Circuit lists a number of factors to solve debt-versus-equity problems:

- whether the corporation is so grossly undercapitalized that the loans are in fact needed for capital purposes and are actually intended to be risked capital rather than a loan;

- whether the purported loans were made in proportion to equity holdings;

- whether the repayment of the loan was predicated on the success of the venture;

- whether there was a fixed date for payment of the note and a reasonable expectation of payment by that date;

- whether the note was subordinated to other corporate debts;

- whether third parties would have made the loan under the same conditions;

**[\*29]** • whether the claimed loan was secured by a mortgage or otherwise;

• whether a provision was made for a sinking fund to retire the loan;

• whether the person making the purported loan participated in the management of the corporation; and

• whether the corporation had a large proportion of debt to equity.

J. S. Biritz Constr. Co. v. Commissioner, 387 F.2d 451, 457 (8th Cir. 1967), rev'g T.C. Memo. 1966-227; see also Uneco, 532 F.2d at 1208.

The factors are not equally significant, and no one factor is determinative. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). And because debt-equity questions can arise in so many different circumstances, not all the factors are relevant to every case. J. S. Biritz Constr. Co., 387 F.2d at 456-57. This is especially true when the case involves a sole shareholder making a loan advance to his corporation. Id. at 457-58. Our overall analysis seeks to determine "whether there was an intent to create a debt with a reasonable expectation of repayment and, if so, whether that intent comports with the economic reality of creating a debtor-creditor relationship." Delta Plastics, 2003 WL 648856, at \*3 (citing Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973)).

We agree with the Commissioner that the relevant factors in this case make it more likely than not that the note didn't represent a *bona fide* debt. The note here

**[\*30]** had no maturity date--that blank was not filled in. And H & M issued the note in 1992, but didn't make a single principal payment until it paid off the note in 2009. The absence of a fixed maturity date indicates "that repayment was in some way tied to the fortunes of the business, indicative of an equity advance." Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); see also Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991). The Commissioner wins this point.

It is unlikely that a third party would lend money to H & M with terms that included no maturity date, no principal payments for 17 years, and only sporadic payments of interest in varying amounts. When a corporation gets a loan that it could not acquire on similar terms from an outside lender, that "loan" looks more like equity than debt. Segel v. Commissioner, 89 T.C. 816, 828-29 (1987). This factor supports the Commissioner.

The note was also unsecured--the parties left blank that portion of the note form. A lack of security for repayment of a purported debt is some support for calling it equity, but security isn't as important when related parties are involved. See Litton Bus. Sys., Inc., 61 T.C. at 381; Am. Underwriters, Inc. v. Commissioner, T.C. Memo. 1996-548, 1996 WL 726365, at \*8. And few parties are as closely related as a 100% owner and his corporation. This "adequately substitutes for an independent security interest" or at least minimizes its importance. Litton

**[\*31]** <u>Bus. Sys., Inc.</u>, 61 T.C. at 381; <u>see also</u> <u>J. S. Biritz Constr. Co.</u>, 387 F.2d at 459. We give this factor no weight.

Even though H & M had enough cash and retained earnings to pay off the note in full in 1992 and the years at issue, H & M didn't make any principal payments on the note until 2009. And H & M paid off the note in full in 2009 only after the Commissioner questioned the transaction. <u>See</u> <u>O. H. Kruse Grain & Milling v. Commissioner</u>, 279 F.2d 123, 126 (9th Cir. 1960), <u>aff'g</u> T.C. Memo. 1959-110. Schmeets testified that he couldn't recall why H & M didn't pay interest in some years and that the amounts H & M did sometimes pay as interest beginning in 1999 were based on what he and his wife thought the corporation should pay and not on what was actually due under the note. Schmeets--both the noteholder and 100% shareholder--was also H & M's president and had check-signing authority. This gave him the ability to pay the note, but he never did until the Commissioner started H & M's audit. We have to find that Schmeets didn't intend to enforce payment of his note and wouldn't have asserted his rights as a creditor to do so. Evidence that a creditor didn't intend to enforce payment of the note or was indifferent as to when the note was to be repaid shows there wasn't a valid loan. <u>See, e.g.</u>, <u>Gooding Amusement Co. v. Commissioner</u>, 23 T.C. 408, 419 (1954), <u>aff'd</u>, 236 F.2d 159 (6th Cir. 1956); <u>Todd v. Commissioner</u>, T.C. Memo. 2011-123,

**[*32]** 2011 WL 2183767, at *5, <u>aff'd</u>, 2012 WL 3530259 (5th Cir. Aug. 16, 2012). This factor definitely favors the Commissioner.

We think that H & M's purported business purpose for compensating Schmeets with a promissory note rather than just paying him in 1992 is also questionable. Schmeets testified that although H & M had the funds available to pay off the note in full in 1992, it didn't want to make a lump-sum payment because it was going to use some of the funds to develop his inventions. But there isn't any evidence to back this up--the record doesn't reflect that Schmeets had even invented the boat step or the collapsible shelf bracket by 1992, and the corporation's board minutes from that year make no mention of the inventions. And even if the inventions existed in 1992 and H & M paid Schmeets sporadically because it needed the funds to develop the inventions, this would show that the note's repayment was tied to the success of H & M's business--more proof that the note was equity. <u>See Provost v. Commissioner</u>, T.C. Memo. 2000-177, 2000 WL 687889, at *5, *8.

Even though H & M consistently treated the note as a liability on its tax returns and deducted the amounts it paid to Schmeets as interest, our review of the relevant factors shows that neither H & M nor Schmeets intended to create a *bona fide* debt. The history of sporadic payments on the note and the fact that H & M

**[*33]** didn't pay any dividends in the years at issue reflect that Schmeets used the note as a way to get money out of the corporation whenever he and his wife felt like it.  We therefore find that H & M payments on the note were not deductible interest.[16]

III.    Net Operating Loss

On its 2001 tax return H & M claimed a net operating loss deduction of $18,661.  Section 172 generally allows taxpayers to deduct net operating loss carrybacks and carryovers.  H & M concedes in its posttrial brief that its net operating loss deduction for 2001 depended entirely on whether the note issued to Schmeets represented a valid debt--it says the disallowance of the interest deductions eliminates the net operating loss entirely.  Our finding that the note didn't represent *bona fide* indebtedness means that we have to entirely disallow H & M's 2001 net operating loss deduction.

---

[16] H & M also asks us to determine when Schmeets constructively received the note because he disagrees with the Commissioner's decision to assess employment taxes on a theory that Schmeets constructively received the note in 1992.  We do not have jurisdiction to review the Commissioner's assessment of employment taxes in a deficiency case.  See sec. 7442; Judd v. Commissioner, 74 T.C. 651, 653 (1980); Griffin v. Commissioner, T.C. Memo. 1995-246, 1995 WL 338552, at *2.

**[*34]** IV.     Other Deductions

Section 162(a) allows taxpayers to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Sec. 162(a). But taxpayers must substantiate their deductions by maintaining adequate supporting records. See sec. 1.6001-1(a), Income Tax Regs. The mere fact that taxpayers report deductions on their returns isn't alone enough to substantiate them. See, e.g., Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). And section 274(d) adds even stricter substantiation requirements for some categories of deduction. See sec. 274(d); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985); Sanford v. Commissioner, 50 T.C. 823, 827-28 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969).

We'll look at those first.

A.     Section 274 Expenses

| Year | Depreciation | | Travel | | Vehicle insurance | | License fees | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Per return | Per IRS | Per return | Per IRS | Per return | Per IRS | Per return | Per IRS |
| 2004 | $1,775 | $501 | $1,322 | $179 | $517 | $65 | $80 | $10 |
| 2005 | 1,775 | 501 | 2,146 | 268 | 517 | 65 | 117[1] | 10 |

[1] The notice of deficiency mistakenly says that H & M deducted $80 for license fees in 2005 and includes $37 as part of the amount deducted for "dues". Based on the documentation H & M provided at trial, we find $117 was the

**[*35]** appropriate amount and have adjusted accordingly the amount
deducted for "dues" in the table below.

Section 274 subjects all travel expenses, including vehicle expenses, to more detailed substantiation requirements. See secs. 274(d), 280F(d)(4)(A). To satisfy section 274, a taxpayer must substantiate--by adequate records or other corroborating evidence--the amount, time, place, and business purpose of the expense. Sec. 274(d). A combination of records and documentary evidence will satisfy the adequate records requirement if it sufficiently establishes each element of the claimed expense. Sec. 1.274-5T(c)(1) and (2), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985).

While a contemporaneous log isn't necessary to satisfy the adequate records requirement, a taxpayer must provide evidence to corroborate his reconstruction of each of the elements. Id. Without adequate records, a taxpayer may establish an element by his "own statement, whether written or oral, containing specific information in detail as to such element," and by "other corroborative evidence sufficient to establish such element." Sec. 1.274-5T(c)(3), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985).

1. Travel Expenses

H & M offered a reconstructed auto log for 2004 and a collection of handwritten notes, receipts, and credit-card statements to substantiate its travel

**[\*36]** expenses for 2004 and 2005. Schmeets put together the 2004 log with the help of H & M's accountant using at least in part his noncontemporaneous oral statements about trips he took and the purposes of those trips. But the log contained a number of inaccuracies--for example, it listed at least four trips in 2004 to a business called T.J. Manufacturing, a firm that was out of business by then--and doesn't appear to be based on any contemporaneous records.

And while receipts can be sufficient evidence by providing the amount, name, location, and date of a travel expense,[17] H & M's collection of oil-change and gas-station receipts fails to show a business purpose. See, e.g., Irwin v. Commissioner, T.C. Memo. 1996-490, 1996 WL 626334, at \*6, aff'd without published opinion, 131 F.3d 146 (9th Cir. 1997). H & M's only proof of that essential datum was Schmeets's vague testimony about how he used H & M's pickup truck to drive to manufacturers and one time to pull a boat to a marina to demonstrate the boat step. But H & M failed to show that these events occurred in

---

[17] Documents like receipts are generally sufficient proof of an expenditure as long as there is enough information to identify the amount, date, place, and character of the transaction. See sec. 1.274-5(c)(2)(iii), Income Tax Regs. For example, a restaurant receipt is sufficient evidence of a business meal if it identifies the name and location of the restaurant, the date and amount of the meal, and the number of people served. Id. Receipts often fail as proof because they don't show any particular business purpose. Id.

[*37] 2004 and 2005,[18] and Schmeets's mere recollection isn't enough to substantiate H & M's claim. Even though the Commissioner could've disallowed these expenses entirely, he allowed $179 for 2004 and $268 for 2005, so we will limit H & M's travel expenses to these amounts.

## 2. Depreciation

H & M also claimed depreciation deductions in 2004 and 2005 for its pickup truck, though it didn't specify on its returns the actual "[b]usiness/investment use percentage" for those years.[19] Section 167 allows taxpayers to deduct a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business. Sec. 167(a); see also sec.1.167(a)-1(a), Income Tax Regs. The purpose is to allow taxpayers to recover the cost of their investments as they are used. United States v. Ludey, 274 U.S. 295, 300-01 (1927). But section 274 limits depreciation of listed property, which includes "any passenger automobile" and "any other property used as a means of transportation." See secs. 274(d), 280F(d)(4)(A)(i) and (ii). Since H & M has failed to adequately substantiate the

---

[18] While H & M offered invoices and other documents related to the manufacture of the boat step in earlier years, it didn't offer any for 2004 or 2005; and Schmeets's boat-step log even noted a "pause in activity" in those years.

[19] Its 2004 log did say it used the truck over 57% of the time for business, but we have found that log unreliable. And it didn't offer any evidence to show a percentage of use for 2005.

**[*38]** business purpose for its use of the pickup truck, we sustain the Commissioner's determination disallowing most of H & M's depreciation deductions.

### 3. Vehicle Insurance

To substantiate its vehicle-insurance deductions, H & M provided copies of two insurance-premium invoices from 2004 in the amounts of $247 and $270 and two invoices from 2005 in the amounts of $280 and $273.50 from Nodak Mutual Insurance Company and addressed to H & M. But only one of the invoices states that it is for vehicle insurance, and the policy number listed on that invoice doesn't match the others. It also appears, based on these invoices, that H & M deducted the full amounts of the premiums on its 2004 and 2005 returns, even though its 2004 log showed personal use of its vehicles. Because H & M's other documents don't adequately substantiate business purpose either, we agree with the Commissioner on this issue as well.

### 4. License Fees

H & M produced two checks made out to the North Dakota Department of Transportation--a 2004 check for $80 and a 2005 check for $117--to show it paid the vehicle-license fees at issue. While the checks make clear that H & M spent

**[\*39]** these amounts, H & M has not specified the fees' business purpose as section

274 requires, so we find for the Commissioner on this issue.

### B. Other Expenses

| Expense | Tax year 2004 | | Tax year 2005 | |
|---|---|---|---|---|
| | Per return | Per IRS | Per return | Per IRS |
| Legal | $750 | $525 | $690 | $690 |
| Insurance--product liability | 486 | -0- | 486 | 40[1] |
| Insurance--other | 1,714 | -0- | 2,102 | -0- |
| Magazine subscription | 39 | -0- | 39 | -0- |
| Office supplies | 201 | -0- | 96 | -0- |
| Miscellaneous | 391 | -0- | -0- | -0- |
| Fees | 30 | -0- | 526 | -0- |
| Dues | -0- | -0- | 290 | -0- |

[1] The notice of deficiency mistakenly says H & M deducted $446 for product-liability insurance in 2005, so it disallowed only that amount.

### 1. Legal and Professional Fees

The Commissioner disallowed a portion--$225 for tax year 2004--of the legal

and professional fees H & M deducted on its returns as being attributable to a

nondeductible personal expense. H & M admitted at trial that the disallowed

portion of these expenses was to prepare Schmeets's Social Security application

**[\*40]** form.  This was obviously a personal expense.  H & M can deduct only the amounts the Commissioner already allowed for legal expenses.

2.    Product-Liability Insurance

On its 2004 and 2005 tax returns H & M deducted the premium payments it made on a business-liability insurance policy.  To support its deduction, H & M provided copies of the policy and copies of payment notices for $486 each addressed to H & M for 2004 and 2005.  Schmeets also credibly testified at trial that H & M had obtained the policy because it had several individuals testing the boat step during those years and, as someone experienced in the insurance industry, he didn't want to distribute a product to the general public without insurance.  Considering the documentation H & M provided and Schmeets's testimony, we find the premium payments were an expense incurred in H & M's business of developing the two inventions, and it is entitled to deduct $486 in tax years 2004 and 2005.  See sec. 1.162-1(a), Income Tax Regs.; see also sec. 174; Snow v. Commissioner, 416 U.S. 500, 503-04 (1974).

3.    Other Insurance

H & M also claimed deductions in 2004 and 2005 for premiums paid on long-term care insurance coverage for Schmeets and his wife.  Schmeets testified that H & M paid these premiums as compensation for their services as its directors,

**[*41]** and that H & M provided billing statements to substantiate its deductions.  But these billing statements are addressed to Harold H. Schmeets and Mona F. Schmeets--not to H & M--and H & M didn't provide us with any evidence that it actually paid the premium amounts.  We find for the Commissioner.

4.      Magazine Subscription

The Commissioner disallowed H & M's deduction for a magazine subscription in 2004 and 2005 as a nondeductible personal expense.  H & M did pay for a subscription to Bottom Line/Personal for those years, but general-interest subscriptions are generally nondeductible personal expenses.  See sec. 262; Wallendal v. Commissioner, 31 T.C. 1249, 1252 (1959); Coffman v. Commissioner, T.C. Memo. 2000-7, 2000 WL 10438, at *2.  And Bottom Line/Personal is, as its title indicates, a general-interest magazine that contains a significant amount of information that is inherently personal.  Even though the magazine does appear to contain some invest-ment-related articles and Schmeets testified that H & M subscribed to Bottom Line for its investment advice, we are not convinced the magazine was an ordinary and necessary business expense and therefore sustain the Commissioner's disallowance.

[*42]        5.        Office Supplies

H & M also claimed deductions for various office supplies, including postage, ink cartridges, and computer software, which the Commissioner disallowed in full for tax years 2004 and 2005.  At trial, Schmeets testified that H & M bought the supplies because they were trying to make bifold sales brochures. But H & M never provided samples of these sales brochures or evidence that they were ever made.  This is a close question, but such supplies are so commonly used for personal purposes that we find it more likely than not that H & M--which produced only evidence of the *cost* of these supplies--didn't actually buy them as an ordinary and necessary expense of developing the boat step and collapsible shelf inventions.  The Commissioner wins this one.

        6.        Miscellaneous Expenses

On its 2004 tax return H & M deducted $391 as miscellaneous business expenses.  H & M provided us only with several receipts (one barely legible and one dated in 2005) totaling $90, and, outside its scribbled notations across the receipts, failed to produce any evidence showing the business purpose of the expenses.  We disallow H & M's claimed deduction for miscellaneous expenses in full.

**[*43]**        7.        Fees

To support its 2004 and 2005 deductions for fees, H & M produced two checks for 2004 made out to the secretary of state and the North Dakota Department of Revenue for $25 and $5, respectively,[20] and three checks for 2005--one for $25 made out to the secretary of state, one for $250 made out to Mona Schmeets, and one for $250 made out to Harold Schmeets. H & M indicated that the two $25 checks to the secretary of state were corporate filing fees for its annual report and the $5 check to the North Dakota Department of Revenue was a late fee for its sales tax filing. Except for the nondeductible $5 late fee, sec. 162(f); see sec. 1.162-21(a), Income Tax Regs., we agree with H & M that these expenses were ordinary and necessary expenses incurred in its trade or business and will allow them.

As to the two $250 checks, Schmeets testified that H & M paid these fees to him and his wife for serving as the corporation's directors. But H & M failed to provide--though Schmeets testified to its purported existence--its minute book establishing that Schmeets and his wife devoted time to directors activities in 2005. The only evidence H & M offered to show its directors' services was Schmeets's

---

[20] H & M also claimed a deduction for directors' fees totaling $500 in 2004, but the Commissioner didn't challenge the deduction in the notice of deficiency, so those fees are not at issue.

**[\*44]** testimony that he and his wife would talk about the business and fill out the minute book and that they came up with an amount they thought was a "conservative figure" for directors services and paid it.  In the absence of the corporation's minute book entries for 2005, we find the expense wasn't an ordinary and necessary business expense and therefore disallow H & M's deduction for directors fees in 2005.

## 8.    Dues

The Commissioner also disallowed H & M's deduction for $290 in dues for tax year 2005.  H & M did provide a 2005 check for $290 made out to Harvey Country Club, but it did not show that this expense had any business purpose.  We therefore find for the Commissioner on this issue.

## V.    Penalties

The Commissioner seeks a 20% accuracy-related penalty under section 6662(a) for underpayments of tax in the years at issue.  He has to peg this penalty to (1) negligence, (2) disregard of rules or regulations, or (3) a substantial understatement of income tax by H & M.  See  sec. 6662(b)(1), (2).

Once the Commissioner provides some evidence that an underpayment is attributable to negligence, disregard of the Code and regulations, or a substantial understatement, the taxpayer has the burden of proving the Commissioner's penalty

**[\*45]** determination was incorrect. <u>See</u> Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-47 (2001). A taxpayer can meet this burden by showing that, under all the facts and circumstances, it acted with reasonable cause and in good faith. Sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

When an underpayment of tax is attributable to negligence or disregard of rules or regulations, we can impose a 20% accuracy-related penalty. Sec. 6662(a) and (b)(1). Negligence is "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). The Code and accompanying regulations define negligence as the failure to make a reasonable attempt to prepare one's tax returns, keep adequate books and records, substantiate items properly, or otherwise comply with the Code. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Disregard of rules includes careless, reckless, or intentional disregard of Code provisions or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs. A disregard of rules is careless if the taxpayer doesn't exercise reasonable diligence to determine the correctness of a return position that is contrary to rules or regulations. Sec. 1.6662-3(b)(2), Income Tax Regs. An understatement is substantial if it is more than $10,000 or 10% of the tax required to be shown on the return, whichever is greater. Sec. 6662(d)(1)(B).

**[*46]** We have found that the payments Schmeets received under the employment and salary-deferment agreements were not disguised purchase-price payments to H & M. H & M is therefore not liable for the section 6662(a) penalty on this issue. Because we found for H & M on the first issue, we don't think H & M's understatement of income tax will exceed $10,000, so the Commissioner's only remaining grounds for imposing the section 6662(a) penalty are negligence or disregard of the rules or regulations.

As to H & M's disallowed deductions for payments it made to Schmeets under the $120,000 note in tax years 2002 through 2005 and the disallowed net operating loss for 2001, we find H & M's underpayments were due to negligence and it is liable for the 20% penalty. H & M failed to treat the note as a *bona fide* debt by not making principal payments for 17 years and by making interest payments in varying amounts only in certain years. Despite its treatment of the note, H & M deducted the payments it made to Schmeets as interest and did not make a reasonable attempt to comply with the Code and regulations. This caused H & M to report a bogus net operating loss in 2001.

We also find H & M liable for the 20% accuracy-related penalty on the portions of the underpayments due to the disallowed business expense deductions for 2004 and 2005. H & M didn't keep adequate records to substantiate its vehicle-

[*47] expense deductions, and to any reasonable person many of the other expenses it deducted were nondeductible personal expenses. This shows a lack of due care on H & M's part and a failure to do what a reasonably prudent corporation would do under the circumstances.

H & M did not make any arguments as to why it wasn't liable for the accuracy-related penalty under section 6662(a) for the tax years at issue, other than that "[t]his case presents clearly defined issues which are questions of fact. H & M, Inc. has asserted positions that are reasonable in light of the facts and it is impossible to reach the conclusion that H & M, Inc. acted in either a negligent manner or in disregard of existing rules or regulations." We do not think H & M has met its burden to prove the Commissioner's penalty determinations were erroneous.

Decision will be entered

under Rule 155.