T.C. Memo. 2013-45

UNITED STATES TAX COURT

ALAN R. PINN AND TONI A. PINN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DAVID R. PINN AND DIANE PINN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 767-07, 768-07.[1]          Filed February 11, 2013.

Jerold A. Reiton, Aaron M. Valanti, and Christian E. Picone,

for petitioners.

Jason W. Anderson, David S. Weiner, and Angela B. Friedman,

for respondent.

---

[1] We consolidated Alan R. Pinn and Toni A. Pinn v. Commissioner, docket No. 767-07; and David R. Pinn and Diane Pinn v. Commissioner, docket No. 768-07, for trial, briefing, and opinion.

**[\*2]**      MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Alan and David Pinn borrowed money from a welfare benefit fund in 1999 and 2000, and haven't paid it all back.  The Commissioner says they should have reported cancellation-of-debt (COD) income for 2002 when the fund listed the loans as in default on an information return that it filed with the federal government.  The Pinns and the lender disagree, arguing that the loans remain in force and are fully collateralized.

## FINDINGS OF FACT

I.      <u>Beginnings and Businesses</u>

The Pinn brothers started out as high-school teachers in the Santa Clara Valley south of San Francisco.  The pay wasn't great, so they decided to supplement their income with summer projects.  One summer they headed up to Lake Tahoe to build and sell a cabin.  To their great amazement, and with the help of low-cost student labor, their profit on the sale was greater than their yearly teaching salaries.  The next summer they built another cabin and succeeded again.  Their success led them to abandon teaching and pursue homebuilding full time.  Within seven years the brothers were building 300 houses a year.  And over the last 35 years, the company they founded has built 6,000 homes.

[*3]  The Pinns also stitched together a number of different business entities:

- Pinn Brothers Construction, Inc. (PBC), which builds the homes;

- BWS, Inc. (BWS), which repairs PBC-built homes that are subject to an implied warranty;[2]

- Development Sales Concepts, Inc. (DSC), which markets homes built by PBC;

- White Oaks Investors, Inc., which provides warranties for certain homes and insulates PBC from liability; and

- Pfeiffer Ranch Investors, Inc., which owns the land on which PBC builds.

With the exception of Pfeiffer Ranch, which implemented an employee stock-ownership plan, each corporation's shares were quartered among Alan, David, and their wives. Alan was president and David was vice president of each company until 2007, when Alan's son Greg became president of all the companies. The various entities had a total of about 140 employees in 1999, about 10% of

---

[2] California courts created an implied warranty that new buildings are "designed and constructed in a reasonably workmanlike manner." Pollard v. Saxe & Yolles Dev. Co., 525 P.2d 88, 91 (Cal. 1974). Although the statute of limitations for claims involving construction defects varies depending upon the nature of the claim or defect, no claim for breach of an implied warranty can be brought against a builder if more than ten years has passed since the "substantial completion of the project." See Cal. Civ. Proc. Code secs. 337.1, 337.15, 338(b) (West 2006). (These cases involve a lot of nontax authorities. Our references to just plain "sections" are to the Internal Revenue Code in effect for 2002.)

[*4] whom were in management with the rest out in the field actually building homes. And about 90% of all these employees worked full time. Although each corporation was separate from PBC, payroll for all the corporations was administered through PBC under a common-paymaster agreement.[3]

II. The Death-Benefits-Only (DBO) Plan[4]

In 1999 the Pinns met with their accountants at Crawford, Pimental & Co., Inc., and Bret Petrick--an "insurance expert" who advised the Pinns on employee-benefit plans. Marshall Katzman, one of Petrick's business associates, presented a slideshow entitled "American Workers Benefit Fund, THE '419' PLAN WITH A DIFFERENCE!"[5] The slides outlined how the Pinns could obtain preretirement

---

[3] If two or more related corporations employ the same individual, one of the corporations can serve as the common paymaster for all of the related corporations. See sec. 31.3121(s)-1, Employment Tax Regs. This allows the group of companies to be treated as a single employer, which prevents them from having to pay more in total Social Security and Medicare taxes than a single employer would have to pay. Id. The firm that's chosen to be the common paymaster pays all employees, files information and tax returns, and issues Forms W-2 for wages that it pays. Id.

[4] As the name implies, a death-benefits-only (DBO) plan gives only death benefits to covered employees.

[5] A "419 plan" refers to a "welfare benefit fund" that is governed by sections 419 and 419A--sections that limit the deduction employers can take for contributions made to a welfare benefit fund. A welfare benefit fund is defined as a fund "which is part of a plan of an employer, and through which the employer provides welfare benefits to employees or their beneficiaries." Sec. 419(e).

**[*5]** life insurance through a union-sponsored welfare benefit fund. According to the slideshow, life-insurance premiums would be fully deductible to the sponsoring employer, and very little current income would have to be recognized by the employee-participants. The Pinns liked what they heard, and decided to sign PBC up.

### A. The Union Arrives

Signing up meant that PBC had to sign some kind of union contract, which it did with Local 707 of the National Production Workers Union (Local 707),[6] on December 18, 1999, when it recognized Local 707 as the exclusive bargaining agent for its "full-time office personnel." As we've already mentioned, most PBC employees were job-site laborers, and many of PBC's other employees were

---

[6] Local 707 operates out of Oak Brook, Illinois. It is not a very large union and has had some problems. See, e.g., Prod. Workers Union, Local 707 v. NLRB, 161 F.3d 1047, 1055 (7th Cir. 1998) (union persuaded employer to terminate employees for nonpayment of union dues without telling them of their right to object); JMB, Inc., 349 N.L.R.B. 866, 866-69 (2007) (union alleged to have improperly procured union membership).

**[\*6]** professionals, guards, and supervisors[7]--all excluded as well.[8] This left very

few PBC employees eligible to join Local 707, and only four actually did.

B.  The Collective-Bargaining Agreement

On or about December 16, 1999, PBC also joined the American Workers

Master Contract Group.  The American Workers Group was an organization which

represented all the employers of Local 707 members.  The American Workers Group

was responsible for negotiating the master contract[9] with the union.  And PBC, as a

member of the Group, was bound by the terms of the master contract with respect to

its four union employees.

---

[7] The National Labor Relations Act (NLRA) defines a supervisor as an individual who acts as an employer to other employees; he can hire, give instructions to, promote, and fire employees who are under his leadership.  National Labor Relations Act of 1935, 29 U.S.C. sec. 152(11) (2006).

[8] This exclusion was clearly drafted to comport with federal labor law and to avoid any procedural hangups.  For example, managers and supervisors cannot join unions and are not protected by the NLRA.  See, e.g., NLRB v. Yeshiva Univ. Faculty Ass'n, 444 U.S. 672 (1980).  Professional and nonprofessional employees also can't be in the same union unless a majority of the professional employees vote for it.  29 U.S.C. sec. 159(b).  And security guards can only be in unions with other security guards.  Id.

[9] A master contract is a collective-bargaining agreement that describes the terms of employment for all union workers within a particular company, market, or industry.  See 20 Williston on Contracts, sec. 55:19 (4th ed. 2010).

**[*7]** One of the most important of those terms was the master contract's provision for the DBO plan. The master contract stipulated that "the benefits program * * * be administered through the American Workers Benefit Fund in accordance with the terms of the Fund and the rules and regulations created thereunder." The same provision appears in the later master contracts PBC signed on December 19, 2000; December 19, 2003; and December 19, 2006, except that the United Employee Benefit Fund (United Fund) was substituted for the American Workers Benefit Fund (American Fund).

C.  Selection of the Trust

Local 707 and the American Workers Group had set up the American Fund in December 1995, well before the Pinns signed on, to provide the Local's members with their purportedly bargained-for death benefits. The American Fund was crafted to be a voluntary employees' beneficiary association (VEBA),[10] a tax-exempt trust under section 501(c)(9), and a welfare benefit fund under section 419(e).

Since PBC recognized Local 707, the American Fund was supposed to administer PBC's DBO plan (as stipulated in the master contract operating when

---

[10] The Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, sec. 3(1), 88 Stat. at 833 (current version at 29 U.S.C. sec. 1002 (2006)), generally applies to VEBAs.

[**\*8**] PBC joined the American Workers Group).  But the United Fund[11]--a purported VEBA trust with essentially the same terms and employer-trustee[12]--actually ended up administering it.[13]

### D.  Eligibility for Death Benefits

The Pinns were the owners of PBC and so they couldn't join the union representing their employees--or at least the tiny fraction of their employees who had joined Local 707.  But they could, curiously enough, share some of the benefits of union membership.  There was a provision in the master contract requiring the Trust[14] (the American Fund, and later the United Fund) to run PBC's DBO

---

[11] The United Fund was set up by another master-contract group, the Professional Workers Master Contract Group and Local 2411 of the Union of Needletrades, Industrial and Textile Employees.

[12] The American Fund and the United Fund had two trustees--one appointed by the association of employers and another by the sponsoring union.  David Fensler was the employer-trustee for both the American Fund and the United Fund.

[13] The American Fund did, however, at least initially administer the welfare benefit funds sponsored by the Pinns' two other companies, BWI and DSC.  We have no idea why PBC chose the United Fund over the American Fund, but the switcheroo is of no consequence.  Once the American Fund merged into the United Fund on December 18, 2000--about a year after PBC began its DBO plan, but before the tax year at issue--PBC's possible breach of the master contract was cured.

[14] The "Trust" refers to both the United Fund and the American Fund, separately and collectively.

[*9] program. According to the Trust's Plan,[15] nonunion PBC employees who are designated in an appendix can also get the death benefits. But this appendix isn't in the record.

What we got instead was the testimony of David Fensler, the Fund's trustee representing the employers,[16] that the Pinns were--in addition to being PBC's owners and managers--full-time employees who had voluntarily elected to participate in the Plan. Finding that the Pinns were eligible based only on this testimony thus depends on inference, but we think it more likely than not true given the exceptionally management-friendly terms of the contract between PBC (through the American Workers Group) and Local 707 and the course of conduct of everyone involved.

---

[15] The "Plan" refers to the DBO plan offered by the Trust. The terms and conditions governing the Plan--described generally in a booklet known as the Summary Plan Description (SPD)--were set forth in the United Employee Benefit Fund Trust Agreement. Summary descriptions, such as the SPD, "provide communication with beneficiaries *about* the plan, but * * * their statements do not themselves constitute the *terms* of the plan" for ERISA purposes. CIGNA Corp. v. Amara, ___ U.S. ___, 131 S. Ct. 1866, 1878 (2011).

[16] There are monthly reporting statements in the record from Local 707 that suggest two other Pinn companies, BWS and DSC, also set up DBO plans. There are also documents showing that BWS and DSC paid fees to the Trust to administer their respective welfare benefit funds. Fensler testified that both BWS and DSC recognized Local 707 and were employer-participants.

**[*10]** E. <u>Allotment of Death Benefits</u>

Under the Plan, the Trust promises to provide death benefits to eligible and enrolled employees in the amount agreed to by their employer. To fund the death benefits, the Trust buys and maintains life-insurance policies with money from the participating employer. The employer also has to pay all of the Trust's costs in providing the death benefits to its covered employees. Employees, however, become ineligible for Plan benefits when their jobs end (for reasons other than death)[17] or if their employer drops out of the Plan[18] or if the Plan itself dissolves.[19]

PBC agreed to provide both David and Alan Pinn with a death benefit equal to ten times their annual salary up to a ceiling of $6 million and the Trust bought enough life insurance to fund those obligations. The Trust owned these policies but allowed the Pinns to irrevocably designate beneficiaries of their death benefits.[20]

---

[17] Upon termination, however, an employee has the right to purchase the policy on his life for its current net value.

[18] Although an employer may not unilaterally terminate its participation in the Plan, it may negotiate out of it through collective bargaining.

[19] All Plan assets, however, would be distributed to currently participating employees on a *pro rata* basis according to an actuarial determination of the reserves then being held to provide the benefits.

[20] It's likely the Trust allowed a beneficiary designation to be irrevocable so that an employee-participant could designate a beneficiary and still have the death

(continued...)

**[\*11]** The paperwork is quite unclear. The Plan makes it seem as though the Pinns' beneficiaries were to receive the death benefits directly from the Trust; but the life-insurance policies and annuities also list the Pinns' trusts as the beneficiaries of the life-insurance policies and annuities themselves. It seems possible, then--though we refrain from even guessing about its probability or consequences--that if David or Alan died, their beneficiaries could collect directly from the insurance companies.

Here's a summary of the annuities and life-insurance policies the Trust purchased for the benefit of Alan Pinn:

---

[20](...continued)
benefits excluded from his estate for federal estate-tax purposes. See generally sec. 2042(2); Morton v. United States, 457 F.2d 750, 753 (4th Cir. 1972); sec. 20.2042-1(c), Estate Tax Regs. Cf. Estate of Thompson v. Commissioner, T.C. Memo. 1981-200, 1981 Tax Ct. Memo LEXIS 547, at \*18-\*21 (rejecting taxpayer's argument that beneficiary designation was intended to be irrevocable--and thus not an "incident of ownership" under section 2042(2)--after finding that taxpayer couldn't establish that designation was, in fact, irrevocable).

**[*12]**

| Policy # | Listed owner | Face value | Listed employer | Beneficiary |
|----------|--------------|------------|-----------------|-------------|
| Ameritas[1] #2477 | American Fund | N/A | BWS | Pinn Ultra Trust (may have changed after 1998) |
| Ameritas #2479 | American Fund | N/A | DSC | Alan R. & Toni Ann Pinn Trust |
| Lincoln[2] #2943 | American Fund | $2,750,000 | BWS | Alan R. & Toni Ann Pinn Trust |
| Lincoln #2944 | American Fund | 6,000,000 | DSC | Alan R. & Toni Ann Pinn Trust |
| Lincoln #0285 | United Fund | 6,000,000 | PBC | N/A |

[1] Ameritas refers to Ameritas Life Insurance Corp.

[2] Lincoln refers to Lincoln Benefit Life Co.

And the life-insurance policies covering David Pinn:

**[*13]**

| Policy # | Listed owner | Face value | Listed employer | Beneficiary |
|---|---|---|---|---|
| Southland[1] #4378 | American Fund | $2,000,000 | White Oaks | Pinn Insurance Trust |
| Southland #4381 | American Fund | 3,000,000 | DSC | Pinn Insurance Trust |
| Southland #3389 | United Fund | 6,000,000 | PBC | Pinn Insurance Trust |
| Lafayette[2] #732U | American Fund | 750,000 | BWS | Pinn Insurance Trust (since Aug. 1999) David R. Pinn Ultratrust |
| Lafayette #735U | American Fund | 3,000,000 | DSC | Pinn Insurance Trust (since April 2000) David R. Pinn Ultratrust |

[1] Southland refers to Southland Life Insurance Co.
[2] Lafayette refers to Lafayette Life Insurance Co.

David Fensler, the employer-trustee for the Trust, wasn't the best at recordkeeping; and he didn't get around to updating all of the insurance documentation to reflect United Fund's ownership of the policies until 2009, about nine years after the merger.

**[\*14]** F.   The Plan Loans

According to the Plan, the Trust can provide loans to employee-participants in the event of an emergency or serious financial hardship.  All loans, however, must be secured by a pledge of the employee-participant's death benefits.  The Plan required the borrowing employee to "sign[] a Promissory Loan Note pledging as collateral the actuarially determined present value of the death benefit to which his or her beneficiary is entitled."[21]

In May 1999, Alan applied for a $500,000 hardship loan, and stated that his hardship was a much higher-than-anticipated tax bill.  The Trust withdrew a total of $500,000 from two deferred variable-annuity contracts that the Trust had bought from Ameritas.  Here's a summary of those withdrawals:

| Policy # | Listed employer | Withdrawal amount | Cash value before loan withdrawal | Cash value on 12/02, after loan was made |
|---|---|---|---|---|
| Ameritas #2477 | BWS | $167,000 | $291,329 | $98,246 |
| Ameritas #2479 | DSC | 333,000 | 547,023 | 173,200 |

---

[21] The SPD clarified that "[p]olicy cash values may not be pledged or assigned, because the participant has no right to them."

[*15] The Trust cut Alan two checks: one for $167,000, and the other for $333,000. In June 1999, Alan gave the Trust a $500,000 promissory note in exchange for the money. The note gave the Trust two ways to be repaid--with $50,000 quarterly payments plus 1% interest[22] or with a reduction in his death benefits by the amount of the outstanding loan obligation (including principal and interest). If Alan had stuck to the quarterly repayment schedule, he would have made his final payment in July 2002.

David Pinn followed with a similar loan application in February 2000, and the Trust sent him a $500,000 check in April. The Trust got the money for David's loan by borrowing against three life-insurance policies:

---

[22] To finance Alan's loan, the Trust borrowed against the cash value of two annuities. The amounts withdrawn no longer accrued interest under the annuity contracts. Therefore, instead of charging interest to the Trust rate, Ameritas (the company that issued the annuities) just let less interest income accumulate, reflecting the fact that there was less money in the account earning interest. The Trust, therefore, obtained the $500,000 loan without incurring any additional costs other than the lost opportunity costs associated with the decrease in interest income. The Trust set Alan's interest rate at 1%, which represented the premium it was required to charge for its loans.

[*16]

| Policy # | Listed employer | Loan amount | Cash value at time of loan | Cash value in excess of loan balance at 12/02[1] |
|---|---|---|---|---|
| Southland #4378 | White Oaks | $125,000 | $243,515 | $245,154 |
| Southland #4381 | DSC | 250,000 | 283,043 | 462,697 |
| Lafayette #735U | BWS | 125,000 | 177,321 | 336,153 |

[1] If the loans were outstanding when David died or the contracts were terminated, the insurance companies would keep the proceeds or reduce the cash values of the policies to make sure that they got repaid. Therefore to estimate the cash value for each policy as of December 2002, we had to reduce its stated value (as listed on the policy statements) by the outstanding loan balance.

The Trust funded David's loan with $375,000 from Southland, and $125,000 from Lafayette. Because the Trust got its financing from two different sources that had two different interest rates, David executed two promissory notes instead of one.

In 2004, a few years after the merger of the American and United Funds, the trustee discovered that David Pinn's promissory notes were incorrect. The Trust

[*17] was required to charge David Pinn 1% more in interest than what it was charged by the insurance companies. Because David's promissory notes didn't include enough interest, the Trust asked David to sign new promissory notes--one for $125,000 at 8.5% interest, and another for $375,000 at 7% interest later that year. What we find odd--though perhaps the parties thought it a reformation of the paperwork to match their original deal--is that the new notes stated that they were executed on February 16, 2000, just like the old ones.

If David made all the scheduled quarterly payments, he would have paid back his loan by December 2002. But just as with Alan's notes, David's say that if he doesn't repay the borrowed money within the time prescribed, the "Trustees of the Fund are instructed to deduct the unpaid principal and interest" from his death benefits. We find the parties to have intended to use this language, as well as other language used in the Pinns' notes, to effect an assignment of the Pinns' death benefits as security for the loans.

The Pinns and the Commissioner stipulated that the loans are valid. Cf. Todd v. Commissioner, T.C. Memo. 2011-123, 2011 WL 2183767, at *8, aff'd, 486 Fed. Appx. 423 (5th Cir. 2012). Yet Alan made only one loan payment--in 2007, and David has made none at all. Both parties also agree that the Trust hasn't taken any action against the Pinns to collect any missed payments.

[*18] III.    Form 5500

Form 5500, Annual Return/Report of Employee Benefit Plan, including its schedules and attachments, is used to report information about employee-benefit plans to both the IRS and the Department of Labor.  Both ERISA and the Code generally require any administrator or sponsor of an employee-benefit plan to file a Form 5500 every year.  See sec. 6058; 29 U.S.C. secs. 1021-1031 (2006); sec. 301.6058-1, Proced. & Admin. Regs.

The Trust, as a "large welfare plan" (one with 100 or more employee-participants), had to file a Form 5500 for 2002 and include several schedules and attachments--one of which was Schedule H, Financial Information.  See 29 U.S.C. sec. 1023(a)(1); 29 C.F.R. secs. 2520.103-1, 2520.103-10 (2002).  ERISA also required the Trust to hire an "independent qualified public accountant" to opine as to whether the required schedules (including Schedule H) were presented in conformity with generally accepted accounting principles, and attach that opinion to the Form 5500.  See 29 U.S.C. sec. 1023(a)(3); 29 C.F.R. secs. 2520.103-1(b), 2520.103-2(b) (2002).

This is where the happy arrangement between the Pinns, the Local, the Trust, and the Funds began to tilt into the Commissioner's sights:  The independent CPA refused to sign off on the report called for by Schedule H unless the Trust included

[*19] the loans to the Pinns on Part I of Schedule G, Financial Transaction Schedules--a list of the Plan's loans that were either in default or uncollectible. The CPA concluded that the loans were in default because the Pinns had never made any loan payments, though he did conclude that they were not uncollectible because they were fully secured by the Pinns' death benefits.

The Trust disagreed with the independent accountant, but it needed to file the Form 5500 so it did list the loans on its Schedule G. But it also attached a document that it labeled "Overdue Loan Explanation." In it, the Trust explained its position that the loans were neither uncollectible nor in default:

> The Schedule G loans are not in default because the collateral for each Schedule G loan, the participant-borrower's death benefit provided under the terms of the plan of benefits of the Fund, will provide a payment or distribution to pay the underlying Schedule G loan obligation upon maturity. For the same reasons, the Schedule G loans are not uncollectible since, each Schedule G loan is supported by collateral which is sufficient to repay the Schedule G loan upon maturity.

IV.     The Notices of Deficiency for 2002

What made this a sweet deal is that the Code doesn't limit the deduction employers can take for contributions they make to a welfare benefit fund negotiated under a collective-bargaining agreement. See sec. 419A(f)(5).[23]

---

[23] This exception is based, in part, on the assumption that deductions for

(continued...)

[*20] One might think that the sequence of contribution to deduction to purchase of life insurance to tax-free receipt of loan proceeds would attract the Commissioner's attention. It did. PBC claimed a deduction of more than $300,000 for its fiscal year ending January 31, 2003. The Commissioner determined that PBC shouldn't have taken the deduction and sent the company a notice of deficiency. PBC didn't contest the deficiency notice. The Commissioner then shifted his gaze to the Pinns.

In October 2006, the Commissioner sent David and Alan notices of deficiency for 2002. In them he increased their income by $153,315 each, for payments made by PBC to the Trust covering the cost of the Pinns' life-insurance protection for 2002.[24] The notices also made computational adjustments, and imposed accuracy-related penalties under section 6662.

---

[23](...continued)
contributions to a fund negotiated based on a collective-bargaining agreement will not be excessive because parties to a collective-bargaining agreement are usually adverse to each other. It is easy to imagine an abusive transaction where the bargaining agent for the employees acts in concert with the bargaining agent for the employer, allowing many of the benefits provided to employees who are also owners to be more favorable than the benefits provided to employees who are not owners. The IRS figured this out, too, and in Notice 2003-24, 2003-1 C.B. 853, identified some purportedly collectively bargained arrangements--marketed to business owners by promoters--that not only failed to satisfy section 419A(f)(5)'s requirements for deductibility but also were now classified as listed transactions.

[24] We believe the Commissioner got his numbers by taking the deduction he disallowed PBC, and dividing it by two--asserting a $153,315 deficiency against each Pinn.

**[*21]** The Pinns filed their petitions, but the cases stumbled on their way to trial. Before the first trial date, the Commissioner moved for leave to amend his answers to increase the Pinns' 2002 deficiencies to more than $500,000 each for failure to report COD income. The Commissioner argued that the Trust's 2002 Form 5500, which he got only in pretrial discovery, was what led him to conclude that the Pinns had COD income. Because we found delaying the trial meant that the Pinns wouldn't suffer undue prejudice, we allowed the Commissioner to amend his answers.

The parties then settled the remaining issues, leaving only the COD-income issue for us to try. The Commissioner has the burden of proof in these cases because he didn't raise the COD-income issue until he amended his answers. See Rule 142(a). We consolidated the two cases and tried them in San Francisco--the Pinns were residents of Northern California when they filed their petitions, as they remain today.

OPINION

I.    Cancellation-of-Debt Income

The Code normally treats the discharge of indebtedness as income. Sec. 61(a)(12). The reason is this: When a taxpayer borrows money untaxed, and

**[\*22]** doesn't have to pay it all back, he gets an economic benefit that resembles other income.  See, e.g., United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931); Colonial Sav. Ass'n & Subs. v. Commissioner, 854 F.2d 1001 (7th Cir. 1988), aff'g 85 T.C. 855 (1985).  Our task, when COD income is at issue, is to answer two questions:  (1) is the taxpayer off the hook for any part of the debt? and (2) if so, in what year?

We answer the first question by looking at the "facts and circumstances relating to the likelihood of payment" and deciding whether some or all of the debt will never have to be repaid.  Cozzi v. Commissioner, 88 T.C. 435, 445 (1987).  We look to the actions of the parties, and not just what they say, to gauge their intent.  See id. at 446.  We do not, however, rely on remote possibilities or the mere hopes of those involved.  See Milenbach v. Commissioner, 318 F.3d 924, 936 (9th Cir. 2003), aff'g in part, rev'g in part 106 T.C. 184 (1996).

The result is a necessary fuzziness that becomes fuzzier still because the Code requires taxpayers to make an annual accounting, and even if a debt has clearly become uncollectible, it's not always clear exactly when.  We don't require extreme precision, but our cases do tell us to find some identifiable event fixing the COD amount with certainty in the tax year we're examining.  Cozzi, 88 T.C. at 445; see also Friedman v. Commissioner, 216 F.3d 537, 547-49 (6th Cir. 2000),

**[\*23]** aff'g T.C. Memo. 1998-196.  This identifiable event doesn't have to be a single overt act, but can be any event that falls within a reasonable range of events or times.  We know that "it will often be impossible to find one, and only one, event that clearly establishes the tim[ing] of [the discharge]."  Cozzi, 88 T.C. at 447.

We now look at the facts of their case in light of those rules.

A.      Likelihood That the Pinns Would Pay Back Their Loans

1.      The Lack of Collection Action

The first question, then, is whether it's more likely than not either of the Pinns will have to pay back their loans.  The parties are far apart:  The Commissioner points to the Trust's lack of any collection action as proof that the debts will never have to be repaid.  The Pinns concede the Trust hasn't taken any collection action, but argue that that's because they're not even in default under the terms of the loans.  They argue that those terms gave them two equally acceptable ways to repay-- periodic payments through 2002, or waiting till they die, when the Trust could collect by withholding part of their death benefit.

Without a default--as the loan documents define that term--the Trust isn't allowed to collect on the loans through other means.  But even if the loans were in default, the lack of collection action would not all by itself create COD income.

**[\*24]** <u>See</u> <u>Coburn v. Commissioner</u>, T.C. Memo. 2006-118, 2006 WL 1627897, at \*4.

The Commissioner argues that the Trust had a collection policy requiring that a demand letter be mailed to a delinquent borrower and, if necessary, Forms 1099 would be issued to borrowers who failed to comply. The Commissioner correctly notes that the Trust sent no demand letter to either Pinn in 2002, from which he concludes the Trust must have intended to forgive the loans.

Hmm. There's something to this logic. A creditor's decision not to try to collect a debt may be persuasive evidence of its cancellation, especially when the creditor has a policy or custom of trying to collect its debts in a particular way or at a particular time after default. But there is one problem here: The Trust didn't have a settled policy for collecting on delinquent loans in 2002. The Trustees did discuss whether to adopt one, but never actually did. We are convinced by the credible testimony of Fensler, and the Trust's Board minutes which confirm that it just wasn't the Trust's policy in 2002 to send demand letters; therefore, we don't think the failure to send them is as significant as the Commissioner argues.

**[*25]**          2.          The Death Benefit as Collateral

The key question here is whether these loans remained fully collateralized throughout 2002. The Pinns argue that the loans were, and that this means the loans were not discharged. The Commissioner tries to undermine the foundation of their argument by alleging that the collateral was illusory because

- the collateral could not be death benefits from the Trust because the Pinns are not legally entitled to them under the Plan;

- even if the Pinns are entitled to death benefits under the Plan, those benefits cannot be collateral because their entitlement to those benefits is contingent;

- the collateral can't be the life-insurance policies, because the Pinns don't own the policies and property not owned by the debtor cannot serve as collateral; and

- even if the policies were the Trust's collateral, there is no way for the Trust to use them to secure the Pinns' debts because the Trust allowed them to designate beneficiaries.

Before poking around into whether the Pinns could use their death benefits or life-insurance policies as collateral, we must address whether a fully collateralized debt can be treated as discharged. The answer is a familiar one in this nook of tax law--it depends. Cozzi, 88 T.C. at 445.

Our cases do tell us that there's no discharge if the debtor's obligation is exchanged for services or is simply replaced with another obligation of equal or

**[\*26]** greater value. <u>Caton v. Commissioner</u>, T.C. Memo. 1995-80, 1995 WL 73451, at \*15 (citing <u>United States v. Centennial Sav. Bank FSB</u>, 499 U.S. 573, 581-82 n.7 (1991)). That's reasonable--substituting one obligation for another doesn't, at least in many circumstances, free up assets. See <u>Kirby Lumber Co.</u>, 284 U.S. at 3. It follows that if a reduction in the Pinns' death benefits or capture of insurance proceeds owed (in some way) to them is an adequate alternative form of repayment, there should be no COD income just because the Pinns failed to make their quarterly payments--any more than we would find COD income only because a homeowner stopped making payments on a $50,000 mortgage secured by a house worth a million. See, e.g., <u>2925 Briarpark, Ltd. v. Commissioner</u>, T.C. Memo. 1997-298, 1997 WL 357880, at \*7, <u>aff'd</u>, 163 F.3d 313 (5th Cir. 1999). A default therefore doesn't necessarily result in COD income.

We have certainly held this to be true for nonrecourse debt. A nonrecourse loan is discharged when the creditor seizes the collateral and then uses it to satisfy the debt.[25] See, e.g., <u>Gershkowitz v. Commissioner</u>, 88 T.C. 984, 1014 (1987). Recourse debt can be a little different--actually seizing the collateral upon the

---

[25] The Court also doesn't value the collateral to determine whether there is COD income until the property is actually taken from the debtor to satisfy the obligation. <u>Commissioner v. Tufts</u>, 461 U.S. 300, 308-09 (1983); <u>Coburn v. Commissioner</u>, T.C. Memo. 2005-283, 2005 WL 3298877, at \*1 n.3.

[*27] debtor's default doesn't necessarily extinguish the underlying liability. See, e.g., Lockwood v. Commissioner, 94 T.C. 252, 260 (1990). In Coburn v. Commissioner, T.C. Memo. 2005-283, 2005 WL 3298877, at *4-*5, we found that there was no COD income in the year the taxpayer defaulted on his recourse debt because the lender had several years to enforce the obligation, and hadn't waived his rights to the collateral.

Even if the Trust seized the Pinns' collateral and discharged their debts, it still wouldn't create taxable COD income. In Caton, we held that when a profit-sharing trust offsets the amount of the taxpayer's outstanding loan obligation against his vested-trust benefits, it was a *payment* of the debt by the taxpayer and not a *forgiveness* of the debt. Caton, 1995 WL 73451, at *15. We therefore found the discharge of the debt to be taxable as a constructive distribution from a profit-sharing trust under section 402(a), and not COD income under section 61(a)(12). Id.

We therefore hold that when a debt is collectible and fully secured (where the fair market value of the collateral exceeds the loan balance), default alone will not result in COD income.

[*28]                 a.        Are the Pinns entitled to a Death Benefit

The Commissioner attacks the death-benefit-as-collateral theory by arguing that there's no evidence in the record showing that the Pinns are entitled to any death benefits.  We agree that the plan documentation is a mess, making it difficult to link the death benefits to the Pinns.  However, we have found as a fact that the Pinns were eligible for death benefits.  And the Commissioner has failed to prove otherwise.

b.        Whether the Death Benefit Is Contingent

The Commissioner's next argument is that even if the Pinns' were eligible for death benefits, their rights to the death benefits were too contingent to be a valid form of collateral.  We do find the benefits contingent:  The Pinns won't get them if PBC ceases to participate in the Trust, or if they stop working for PBC, or if the master contract group and Local 707 fail to renew the master agreement.  But the Commissioner argues from this that the repayment of the loans through a set off of those benefits is "highly contingent."  And, according to the Commissioner, this means that they need to recognize COD income when they were scheduled to fully repay their loans, but didn't.

The Commissioner relies on a pair of cases, Zappo v. Commissioner, 81 T.C. 77 (1983), and Jelle v. Commissioner, 116 T.C. 63 (2001).  In Zappo, the taxpayer

**[\*29]** settled with a group of investors who had lent his company money on his guarantee. They agreed to forgive the loans in exchange for some cash and stock in the company. The money was supposed to come from a third-party purchaser who had received certain assets from Zappo's company. But Zappo also gave the investors another guarantee, making him secondarily liable if the third-party failed to make all the payments within five years. On those facts we concluded that Zappo's liability under that agreement was "highly contingent," given the nature of guarantees in general. We also held that there is no real continuation of indebtedness when a highly contingent obligation is substituted for true debt. See Zappo, at 81 T.C. at 89 ("The very uncertainty of the highly contingent replacement obligation prevents it from reencumbering assets freed by discharge of the true debt until some indeterminable date when the contingencies are removed").

Jelle was similar. In that case a lender agreed to write off some of the taxpayers' debt, but if the taxpayers sold certain property within ten years, they would have to pay back the lender all or some of the amount written off. We explained that if an arrangement effects a present cancellation of debt but provides a replacement obligation, the mere chance of some future repayment does not delay the recognition of COD income when the replacement liability is "highly contingent or of a fundamentally different nature." Jelle, 116 T.C. at 69.

**[\*30]** But we are careful to distinguish these as exceptions to a more general rule that "[i]f there exists only an agreement to cancel prospectively, the debt is discharged not at the time the agreement is made but at the time conditions specified therein are satisfied." Id. at 68; see also Seay v. Commissioner, T.C. Memo. 1974-305, 1974 Tax Ct. Memo LEXIS 14, at \*8-\*10. We conclude here that the Commissioner's timing is off. Either of the Pinns might or might not lose his death benefit in the future. See supra p. 11. If and when that happened, the benefits' usefulness as collateral for the loan would disappear. But that hadn't happened in 2002. And we don't find that the pledge of their death benefits to be a "highly contingent replacement obligation." A highly contingent replacement obligation is one where it is highly unlikely, or is impossible to estimate, whether and when the debt will be repaid. Zappo, 81 T.C. at 88. We don't have that here. At least not during the year at issue. Cf. Todd, 2011 WL 2183767, at \*6 (pledge of similar death benefit could serve as security even if not proof that loan was *bona fide*).

c.      Ownership of the Life Insurance Policies

The Commissioner also argues that neither Alan nor David had any ownership rights to the insurance policies or to their cash values. The Commissioner goes on to say that "property owned by the creditor cannot be the

[*31] debtor's collateral." Though generally true, we don't even need to address this argument. Although the Trust provided the death benefits by purchasing insurance, the Trust would still be obligated to pay out the death benefits according to the terms of the DBO plan, whether or not the life-insurance policies were in place. And any money that flowed directly from the insurance companies to the Pinns' beneficiaries was to flow only in the amount that the Trust authorized. The amount that the trust could authorize was dictated by the terms of the DBO plan, so we find that it was the death benefits, not the life-insurance policies, that served as the collateral.

### d. Designation of Beneficiaries

The Commissioner also points to the fact that the Pinns aren't the beneficiaries of the life-insurance policies, alleging that Trust won't be able to recoup the proceeds to satisfy their loans. We disagree.

Based on the record alone we hold that the Trust (through the trustee) could collect the full value of the loans with a reduction of the Pinns' death benefits. The Trust had "endorsements" delivered to the insurance companies ensuring that the life insurance would not be paid out without the approval of the trustee. These documents also require the insurance company to follow the Trust's determination

**[\*32]** of the beneficiaries' rights under the Plan.  But even if such documents were not in place, we would still disagree with the Commissioner.

A welfare benefit fund--like the one in these cases--is considered an "employee welfare benefit plan" subject to ERISA.  See 29 U.S.C. sec. 1002(1) (2006) (defining "employee benefit welfare plan" as "any plan, fund, or program * * * established or maintained by an employer * * *  to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance * * *  benefits in the event of * * * death").

ERISA requires that an "'employee benefit plan [to] be established and maintained pursuant to a written instrument,' 'specify[ing] the basis on which payments are made to and from the plan.'"  Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, 555 U.S. 285, 300 (2009) (quoting 29 U.S.C. sec. 1102(a)(1) and (b)(4)).  ERISA preempts any state law that "relate[s] to any employee benefit plan," 29 U.S.C. sec. 1144(a) (2006), but does not preempt state laws "which regulate[] insurance," id. sec. 1144(b)(2); see also Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 333-34 (2003).

[*33] ERISA does not preclude the assignment or alienation of welfare-plan benefits.[26] Davidowitz v. Delta Dental Plan of Cal., Inc., 946 F.2d 1476, 1478 (9th Cir. 1991). And whether such benefits are assignable is left up to the "free negotiations and agreement of the contracting parties." St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield, 49 F.3d 1460, 1464 (10th Cir. 1995); Davidowitz, 946 F.2d at 1480-81. The assignment of the Pinns' death benefits was made pursuant to the terms of the Plan.

ERISA allows the trustee of the United Fund to bring a civil action, "'to enjoin any act or practice which violates any * * * terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any* * * terms of the plan.'" Sereboff v. Mid. Atl. Med. Servs., Inc., 547 U.S. 356, 361 (2006) (quoting 29 U.S.C. sec. 1132(a)(3)). The trustee may only obtain relief under section 1132(a)(2), however, if the relief sought falls within "'those categories of relief that were *typically* available in equity'" before the merger of law and equity.[27] Sereboff, 547 U.S. at 361 (quoting Mertens v. Hewitt

---

[26] It does preclude the assignment of pension-plan benefits. See, e.g., Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 836 (1988).

[27] Examples of relief "*typically* available in equity" include an "injunction, mandamus, and restitution, but not compensatory damages." Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993). Although--in many situations--a court of equity

(continued...)

**[*34]** <u>Assocs.</u>, 508 U.S. 248, 256 (1993)).  When a fiduciary of a plan governed by ERISA seeks "to impose a constructive trust or equitable lien on particular funds or property in the [nonfiduciary's] possession," it seeks relief of a type that has typically been available in equity.  <u>Id.</u> at 362 (quoting <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 213 (2002)).  Since the United Fund trustee would be seeking "'specifically identifiable' funds that were 'within the possession and control'" of either the beneficiaries or the insurance companies, <u>id.</u> at 362-63 (quoting <u>Mid. Atl. Med. Servs., LLC v. Sereboff</u>, 407 F.3d 212, 218 (4th Cir. 2005), <u>aff'd</u>, 547 U.S. 356 (2006))--as opposed to simply seeking "to impose personal liability * * * for a contractual obligation to pay money," <u>id.</u> at 363 (quoting <u>Knudson</u>, 534 U.S. at 210)--we find that the Trust could properly secure repayment of the loans under ERISA.

    B.    <u>Was There Some "Identifiable Event" in 2002?</u>

Even if we were wrong in our finding that the existence of adequate collateral meant that the Trust had not canceled their debts, the Commissioner would still need some theory--some "identifiable event"--to pin that cancellation to

---

[27](...continued)
did have the power to "establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority," <u>id.</u> (citation and internal quotations marks omitted), the Supreme Court has interpreted 29 U.S.C. sec. 1102(a)(3) not to incorporate such legal remedies, <u>see id.</u> at 256-57.

**[*35]** the 2002 tax year. The Commissioner argues that the "identifiable event" was the Trust's filing of the Form 5500. We agree that the "identifiable event" doesn't have to be one overt act, but can be any event that falls within a reasonable range of events or times. See Cozzi, 88 T.C. at 446; see also L & C Springs Assocs. v. Commissioner, 188 F.3d 866, 870 (7th Cir. 1999), aff'g T.C. Memo. 1997-469. We nevertheless find the Trust's reporting of the Pinn loans as "in default or uncollectible" on Schedule G of Form 5500 was ambiguous. The schedule doesn't distinguish between default and uncollectibility. And there's a difference between the two.

The dictionary defines default as "the failure to pay a debt when due." Black's Law Dictionary 480 (9th ed. 2009). A loan in default, however, may very well be collectible by seizing collateral. Missing a car payment puts a driver in default. But when the repo man takes the car back the loan is satisfied and therefore was collectible, assuming the fair market value of the repossessed car exceeds the loan balance. The finding of the Trust's accountant that the loans were in default, yet collectible, highlights this distinction. We find Schedule G's classification of the loans too ambiguous to find the filing of the Trust's Form 5500 to be the "identifiable event which fixes the loss with certainty." See Cozzi v. Commissioner, 88 T.C. at 445.

**[\*36]** II.     Conclusion

We therefore find that the Commissioner has failed to prove that the Pinns had COD income in 2002.  This may strike learned observers as unusual--there was some evidence in the record that the union associated with the Trust marketed similar plans widely, touting their benefits as including immediate deductions, tax-free loan proceeds, and a long-deferred recognition of income.  See Todd, 2011 WL 2183767, at \*2.  When this is true, a decent respect for the opinions of informed mankind requires an explanation of why we believe our holding will not have a pernicious effect.

The chief of these is that here the parties agreed that the loans were *bona fide*.  Under very similar circumstances, we found in Todd that a similar distribution did not create a loan but taxable income.  See id. at \*8.  Yet even if our reading and rereading and rereading of the arguments actually made in these cases allowed us to call the loans income to the Pinns, the Commissioner would still be stuck.  Alan received his loan in 1999, and David received his in 2000.  These are not the tax years at issue in these cases.[28]  And the Pinns may well have

---

[28] If the taxation of the split-dollar life insurance regulation that went into effect for all arrangements entered into or materially modified after September 17, 2003, was applicable here, the loan proceeds the Pinns received might well have been classified as taxable income under section 61 to them in the years they

(continued...)

**[\*37]** to pay taxes on the loans if they become ineligible for their death benefits, or when their death benefits are used to satisfy their debts. See Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929); Sanders v. Commissioner, T.C. Memo. 2010-279, 2010 WL 5327897, at \*2; McGowen v. Commissioner, T.C. Memo. 2009-285, 2009 WL 4797538, at \*3-\*5, aff'd, 438 Fed. Appx. 686 (10th Cir. 2011); Barr v. Commissioner, T.C. Memo. 2009-250, 2009 WL 3617587, at \*3-\*4; Miller v. Commissioner, T.C. Memo. 2006-125, 2006 WL 1652681, at \*16 (taxpayer taxable on COD income when guarantor paid off balance of loan); Atwood v. Commissioner, T.C. Memo. 1999-61, 1999 WL 109617, at \*2.

All these possibilities we leave for different records and different years. The parties settled many other issues, so

> Decisions will be entered
> under Rule 155.

---

[28](...continued)
received their respective proceeds. See sec. 1.61-22, Income Tax Regs. But we will leave that possibility for another day--or tax year.